KEYWELL AND ROSENFELD v BITHELL

Docket No. 229117. Submitted October 29, 2002, at Detroit. Decided
December 6, 2002, at 9:05 A.M. Leave to appeal sought.

The law firm of Keywell and Rosenfeld brought an action in the Oak-
land Circuit Court against Thomas C. and Irene Bithell, seeking
payment of attorney fees for the plaintiff's representation of the
defendants in matters and Oakland Circuit Court proceedings
related to the defendants' house, into which had seeped sewage
generated by a neighboring country club. The plaintiff, which had
been allowed to withdraw from representing the defendants by the
trial judge presiding over the defendants' actions, sought to recover
under theories of breach of contract, quantum meruit, account
stated, and unjust enrichment. The court, Daniel J. Van Antwerp, J.,
after directing a verdict in favor of the defendants with respect to
the claims of unjust enrichment and account stated, entered judg-
ment on a jury verdict in favor of the defendants with respect to
the claims of breach of contract and quantum meruit. The plaintiff
appealed.

The Court of Appeals *held*:

1. Unjust enrichment is the receipt of a benefit by the defendant
from the plaintiff and an inequity resulting to the plaintiff because
of the retention of the benefit by the defendant. When an unjust
enrichment exists, the law operates to imply a contract in order to
prevent it. However, a contract will be implied only if there is no
express contract covering the same subject matter. In this case,
given that there was conflicting evidence regarding the existence of
an express contract between the plaintiff and the defendants with
respect to a fee agreement, be it either hourly or contingent, the
trial court erred in directing a verdict in favor of the defendants on
the claim of unjust enrichment. The plaintiff is entitled to a new
trial on its claim of unjust enrichment.

2. When an account is stated in writing by the creditor and
accepted as correct by the debtor, either by payments thereon
without demur or by failure within a reasonable time to question
the state of the account as presented, it becomes an account
stated. Giving the plaintiff the benefit of all reasonable doubts,
there was a dispute of fact concerning whether there was an

account stated. Thus, the trial court erred in not allowing the jury to determine the issue as a whole, and the plaintiff is entitled to a new trial on its claim of account stated.

3. The trial court did not abuse its discretion in permitting the defendants to introduce into evidence the testimony of Gary Klotz and Miriam Rosen, attorneys affiliated with the plaintiff, by which they related a statement made by Robert R. Cleary, another attorney affiliated with the plaintiff, that the plaintiff had a contingent fee agreement with the defendants. Pursuant to MRE 802(A) and (D), the statement was not hearsay because it was a party-opponent's own statement and it was a statement by the party's agent concerning a matter within the scope of the agency. The trial court did not abuse its discretion in not allowing the plaintiff to introduce into evidence the testimony of Frederick Keywell and other attorneys affiliated with the plaintiff concerning other statements made by Cleary regarding the fee agreement. Cleary was never the plaintiff's party-opponent.

4. James Elsman, the defendants' expert witness regarding the reasonableness of the attorney fees sought by the plaintiff, did not improperly testify when he said that he had considered Cleary's statement that there was a contingent fee agreement and that Klotz had corroborated Cleary's statement. MRPC 1.5(a)(8) states that one of the factors relevant to whether a fee is reasonable is whether the fee is fixed or contingent. However, Elsman invaded the province of the jury when he commented on Klotz' motivation to tell the truth. Elsman had no specialized knowledge of Klotz' credibility and was the jury's equal in determining whether Klotz was telling the truth. Elsman's testimony on Klotz' credibility may not be admitted in a new trial on remand.

5. The trial court erred when it refused the plaintiff's request that, pursuant to SJI2d 3.13, now M Civ JI 3.13, "Facts Judicially Noticed," the jury be instructed that it must accept it as fact that the plaintiff had withdrawn properly from representing the defendants in the defendants' actions. Collateral estoppel bars the defendants from relitigating the propriety of the plaintiff's withdrawal in light of the decision of the trial judge presiding over the defendants' actions that it was proper for the plaintiff to withdraw under MRPC 1.16(b). At a new trial on remand, the trial court must instruct the jury to accept as fact that the plaintiff had withdrawn properly.

6. Although not perfect, the trial court's jury instructions concerning the plaintiff's burden of proving the existence of a contract for attorney fees on an hourly basis and the defendants' burden of proving that the agreement was changed to a contingent fee agree-

ment correctly allocated the parties' respective burdens of proof and therefore did not constitute error requiring reversal.

7. When instructing the jury about quantum meruit, the trial court did not err in defining quantum meruit as "an amount of recovery as much as deserved," and in explaining that quantum meruit is "an equitable principle that measures recovery under an implied contract to pay compensation as reasonable value of services rendered." However, in light of the fact that the defendants' actions have yet to be tried in full or settled, the trial court should consider whether the jury in a new trial should be instructed that "among the factors to consider is what percentage of total work has been completed by the attorney or attorneys seeking fees to obtain results of the parties."

8. The trial court's jury instructions about the reasonable value of the plaintiff's legal services were consistent with SJI2d 180.03, now M Civ JI 180.03. Although the instructions were made somewhat repetitive with the addition of language from MRPC 1.5, which was already reflected in the standard jury instruction, the instructions were accurate and not confusing. The trial court did not err in telling the jury that a lawyer of ordinary prudence is one who acts reasonably.

Reversed and remanded.

ATTORNEY AND CLIENT — WITHDRAWAL FROM REPRESENTATION — COLLATERAL ESTOPPEL.

Collateral estoppel bars a law firm's former client, in an action by the firm against the client for collection of unpaid attorney fees, from relitigating the issue of the propriety of the law firm's withdrawal from representation where the law firm has been permitted to withdraw by the court deciding the action in which the firm represented the client.

*Kolin & Associates, PLC* (by *Marjorie L. Kolin*), for the plaintiff.

*Carson & Powell, P.C.* (by *Steven C. Powell*), for the defendants.

Before: WHITBECK, C.J., and SAWYER and KELLY, JJ.

PER CURIAM. Plaintiff Keywell and Rosenfeld (K&R) appeals as of right the July 21, 1998, judgment the trial court entered after the jury found in favor of

Thomas and Irene Bithell. K&R, a law firm that has ceased providing legal services and is in the process of dissolving, instituted this action to collect $414,726.85 in attorney fees it claims that the Bithells owe it: $374,169.34 for an easement suit, $3,126.65 for a zoning variance matter, $34,596.93 for insurance litigation, and $2,834.33 for a property tax assessment matter.[1] We reverse and remand.

## I. BASIC FACTS AND PROCEDURAL HISTORY

### A. THE UNDERLYING DISPUTE

In 1984, the Bithells purchased a house in Bloomfield Township for approximately $147,000. The house was directly across the street from the Oakland Hills Country Club (the Club). At the time, a gate at the south end of the Club's driving range allowed people traveling to and from the Club access to Oakhills Drive. However, in 1988, the Club constructed a new gate directly in front of the Bithells' house to allow trucks and machinery access to its property, which considerably increased the traffic and noise around the Bithells' house. The Bithells believed that the Club lacked a necessary zoning variance to make this change.

The traffic and noise were just the start of the Bithells' problems concerning the Club. After the Bithells moved into their house, Bithell developed very serious health conditions. One of Bithell's sons developed an ongoing problem with migraines, and

---

[1] Given the considerable overlap between these four actions and their genesis from the same problem, we refer to all four collectively as the "underlying action." We use "Bithell" to refer to Thomas Bithell and the "Bithells" to refer to the family.

his oldest daughter also became sick. The Bithells did not know that the Club's private sewer line ran under their house to the public sewer line on their property. There was no documentary evidence in the chain of title to the house showing an easement for the sewer. The house had, on a number of occasions, become damp in the basement, but the Bithells were usually able to dry the area. However, the wetness problem became dramatically worse in March 1991 when they discovered raw sewage seeping into the basement and collecting on their property.

The Bithells, who repaired and disinfected their house after the seepage, attempted to resolve the gate and sewage issues with the Club and Bloomfield Township, to no avail. Though Bithell had seen sewage pooling on the Club's golf course across the street from his house, the Club denied that its sewer was leaking onto the Bithells' property. The Club continued to use the sewer, which in turn continued to cause sewage to leak into the Bithells' basement. Bithell only connected his health problems with the sewage problem at the house when he made an off-hand comment to his physician, who reportedly warned him to abandon the house and all its contents immediately. The Bithells then left their home, which had increased in value to approximately $220,000, and all its contents. Later, the Bithells were able to sell the property on which their house was located for $450,000. They then spent $50,000 to destroy the house and remove the debris, and another $200,000 to pay their mortgage and the penalties that had accrued.

## B. K&R'S INVOLVEMENT

In 1991, having just learned of the sewage problem, but before Bithell discovered that his illness was related to the sewage at the house, the Bithells sought legal assistance from K&R. The couple chose K&R because K&R attorney Robert R. Cleary, who specialized in labor and employment law, had worked for Bithell at the Taubman Company for a number of years. Taubman, a major retail shopping center developer, had continued to use Cleary as its attorney even after he left the business for private practice.

K&R attorneys sent a demand letter to the Club on behalf of the Bithells, including their children, asking for $850,000 to settle their dispute. When the Club refused, K&R attorneys sent a letter to the Club, Bloomfield Township, and Township Supervisor Fred Korzon offering to forgo requesting injunctive relief if they agreed to relocate the Bithells to a "comparable home" in the same school district. The other parties rejected this offer as well, prompting K&R attorneys to file a nine-count complaint in Oakland Circuit Court on behalf of the Bithells and their children against the Club, Bloomfield Township, and Korzon. They sought monetary damages and injunctive relief. Generally speaking, at that time the case was a relatively uncomplicated property dispute focused on easement and trespass issues.

After the attorneys filed the complaint, Cleary prepared an "initial litigation plan" for the Bithells. The plan summarized the factual background of the Bithells' claims and candidly discussed the strengths and weaknesses of each claim and potential defense. The plan also stated overall goals with respect to

negotiating a settlement and the possibility of going to trial, identified experts and their expected testimony, and generally described how the firm intended to prepare and manage the litigation. The plan, in section D, described the staffing Cleary anticipated that the case would need, and stated:

> Cost-effective staffing demands an initial evaluation of the elements of the litigation plan and the proper delegation of tasks and responsibilities to the appropriate staff level. In the instant case, it is anticipated that the following staff levels will be utilized to minimize client costs without sacrificing the quality of legal services to be provided:
>
> Partner: Robert R. Cleary
>
> Associates: Lucy R. Benham
>
> Eric B. Gaabo
>
> Robert Cleary and Lucy Benham will retain ultimate responsibility for potentially dispositive decisions and will review all court filings which directly or indirectly impact Plaintiffs [the Bithells]. Lucy Benham is responsible for day to day litigation and discovery strategy and will maintain consistent client contact in all important decisions. Mr. Gaabo will provide legal research as required during the course of this litigation and will be responsible, with Lucy Benham, for drafting all motions, briefs, and discovery pleadings.
>
> The delegation of assignments and responsibilities of this matter will be made throughout the defense of this litigation to ensure that all work is done at the appropriate staff level in order to minimize cost without sacrificing the quality of the legal representation. [Exhibit 1 to K&R's brief on appeal, pp 3-4.]

The plan, in section O, also purported to establish a "fee agreement," stating:

> The legal fees and expenses incurred by Keywell and Rosenfeld in bringing this lawsuit shall be paid as follows:

1. Plaintiffs [the Bithells] shall pay a $7,000 retainer on or prior to July 15, 1991 which shall be applied to Plaintiffs' current balance owed.

2. Plaintiffs shall pay, *on a monthly basis*, twenty five [sic] percent (25%) of all *fees billed* after July 15, 1991.

3. Plaintiffs shall pay, *on a monthly basis*, 100 percent of all *monthly expenses* incurred by Keywell and Rosenfeld in this matter.

4. In the event that Plaintiffs obtain a monetary recovery either through settlement or as damages following trial, Plaintiffs shall pay:

   a. The remaining balance of all fees incurred through July 15, 1991;

   b. The remaining balance of seventy five [sic] percent (75%) of fees incurred after July 15, 1991; and

   c. An additional amount equal to five percent of such monetary recovery.

5. If plaintiffs recover nothing from Defendants through settlement or a trial on the merits, Plaintiffs shall pay:

   a. One hundred percent (100%) of attorney fees, costs and expenses.

Cleary signed the plan on behalf of K&R. The Bithells did *not* sign the plan.

The Bithells later expanded their litigation to include claims regarding the gate the Club had constructed across from their house and an emphasis on the personal injury aspects of the sewage problem, not merely the underlying property issue. Additionally, the Bithells became involved in an action against their insurer for the damage to their house, an administrative zoning proceeding concerning the Club's gate, and a tax proceeding to lower the house's assessed value in light of the sewage problem. K&R represented the Bithells in all these matters. The pretrial processes for these four cases were extremely expensive in that K&R had to pay for court reporters

for depositions, a variety of experts, sewer testing, biological testing, and medical opinions. The Bithells paid K&R's costs through November 1991, although never at the time K&R incurred them. The Bithells stopped paying anything after costs reached $50,000. Evidently, the Bithells calculated the costs amassed to that point, including items or services for which they had directly paid the provider, added those costs to what they had already paid K&R, deducted that subtotal from $50,000, and paid the remaining amount to K&R to the penny; K&R received slightly less than $50,000 for the costs it had already incurred for the Bithells. The Bithells did not pay K&R's fees at all, and those fees continued to mount.

For a period of about nine to ten months in 1992, Cleary did not have time to review the firm's bills for the Bithells' attorney fees and other costs. As a result, the firm did not send any bills during this time to the Bithells. Cleary was busy because, though still a partner in K&R, he had begun substituting for a Taubman attorney who had taken a leave of absence. Taubman was paying K&R a $15,000 retainer each month for Cleary's services, and paying for any additional time Cleary worked for the company on an hourly basis. Taubman had also provided Cleary with office equipment and a special telephone number to facilitate his work with Taubman employees. K&R viewed Taubman as a very important client, not only because of the volume of work it provided the firm, but because it paid its bills promptly. Cleary reported to three individuals at Taubman, including Bithell, who was Senior Vice President for Human Resources and Administration and was responsible for recommending compensation.

Several months into the case, Benham passed the case to K&R partner Elaine Parson. Benham reportedly needed to focus more on her other clients and had more interest and experience in transactional work than litigation. In contrast, Parson had significant experience in litigation. Settlement negotiations with the defendants in the underlying action ultimately failed. In July 1993, as the case was proceeding toward trial, the Bithells retained attorney Lee Wulfmeier to assist with the personal injury aspect of the litigation. Wulfmeier had experience with personal injury and medical malpractice cases, but did not practice with the K&R firm. In the fall of 1993, Cleary, who had never actively worked on the Bithells' case, left K&R to work at Taubman.

On December 14, 1993, Wulfmeier sent Frederick Keywell, one of K&R's founding partners, a letter referring to a meeting they had in order to discuss the fee arrangement. In the letter, Wulfmeier said he thought that the only way K&R would be compensated would be if the Bithells settled or recovered an award at trial. Wulfmeier estimated that the case would require another five hundred hours of attorney work to prepare it for trial, and at least another $25,000 in pretrial expenses. Wulfmeier then proposed an alternative fee agreement:

> It appears to me that the *only* fee solution is to allow for actual costs to be paid first from any recovery; I would then suggest that our respective firms would *each* receive 16.5 percent [one-sixth] of the net recovery. Further, it would be necessary for Keywell and Rosenfeld to remain as active participants in the litigation. If this concept meets with your approval and Mr. Bithell's approval, we could "fine tune" an agreement. Please advise.

The letter did not refer to what, if any, fee agreement K&R and the Bithells already had in place.

Before the trial court in the case involving the easement and personal injury to the Bithells decided a defense motion for summary disposition, K&R moved to withdraw as the Bithells' counsel. According to the February 14, 1994, motion submitted to Oakland Circuit Judge Gene Schnelz:

1. Keywell [the firm] was retained by the Plaintiffs [the Bithells] to represent their interests in this litigation on or about July, 1991.

2. At the time Keywell was retained by the Plaintiffs, Plaintiffs agreed to pay Keywell for its services as the services were performed.

3. Keywell prepared and sent Plaintiffs' bills on a monthly billing schedule beginning July, 1991.

4. In or about mid-1993, the Plaintiffs also retained Lee Wulfmeier of Schureman, Frakes, Glass & Wulfmeier to represent their interest in this litigation.

5. On July 14, 1993, Mr. Wulfmeier filed his appearance on behalf of Plaintiffs in this litigation.

6. To date, Keywell has been paid by Plaintiffs only a small portion of its attorney fees, and, Keywell has paid the majority of the costs incurred in this litigation.

7. *At the present time Plaintiffs are not paying Keywell its attorneys fees, nor are Plaintiffs paying litigation costs Keywell incurs in pursuing this matter. Presently, Plaintiffs owe Keywell, for reimbursement of costs alone, $45,497.31.*

8. Keywell does not wish to continue its representation of the Plaintiffs in these circumstances because Plaintiffs' representation has resulted in an *unreasonable financial burden on Keywell.*

9. Moreover, the Plaintiffs have failed to fulfill their obligations regarding Keywell's services, and the Plaintiffs have been given reasonable warning that Keywell will withdraw unless Plaintiffs meet their obligations.

10. Plaintiffs['] interests are adequately protected by Mr. Wulfmeier and thus, Plaintiffs will not be prejudiced by the withdrawal of Keywell as their attorneys.

11. Keywell has made all of its litigation files directly available to Mr. Wulfmeier for his use and assistance in this matter despite Plaintiffs' lack of payment for Keywell's services.

12. Keywell will continue to make its litigation files available to Mr. Wulfmeier and the Plaintiffs for their assistance in this litigation.

13. Plaintiffs have received notice through protracted negotiations that Keywell intended to seek the Court's permission to withdraw unless Plaintiffs began to pay Keywell's fees and their own costs.[2]

Parson signed the motion and the supporting brief.

The Bithells objected to the motion to withdraw, submitting a February 22, 1994, affidavit from Cleary, who was then working at Taubman. Cleary averred that the Bithells originally had a fee agreement as outlined in the litigation plan, but that the Bithells subsequently acquiesced to a contingent fee agreement that would give K&R "the lessor [sic] of ⅓ of the proceeds of the litigation or settlement plus costs or the total legal fees generated plus costs." Cleary stated that he agreed to this arrangement on behalf of K&R around January 1992, at which time the Bithells owed the firm approximately $100,000 in legal fees, because the Bithells did not have the money to pay K&R.

Fred Keywell responded to the Bithells' objections and Cleary's affidavit with his own affidavit outlining the evidence he claimed supported the Bithells' obligation to pay K&R for costs and fees:

---

² Emphasis added.

2. On November 15, 1993 at 3:00 P.M. I met with Mr. Bithell to discuss the status of his case and of the outstanding fees owed to this firm. Mr. Bithell acknowledged that he owed the firm in excess of $400,000 and stated that if we insisted upon payment at that time, he would be forced into bankruptcy. He asked if we would handle the case on a contingency fee basis. I refused, and told him that I expected that we would be paid for our services.

3. On December 13, 1993 at 10:00 A.M. I met with Mr. Bithell and Lee H. Wulfmeier at our office. The balance due this firm was discussed with Mr. Wulfmeier and Mr. Bithell. Mr. Bithell had previously expressed his desire to me that Mr. Wulfmeier handle the trial of this case. Mr. Wulfmeier stated that we would have to work out a contingency fee arrangement if his firm were to assume the representation of the Plaintiffs [the Bithells].

4. Mr. Bithell then suggested for the first time that his fee arrangement with our firm was already based upon the outcome of the litigation. I expressed surprise and asked Mr. Bithell if he had a writing setting forth such an arrangement.

5. Mr. Bithell stated that he did not have such a writing but that Mr. Cleary had agreed to a contingency fee arrangement.

6. I subsequently spoke to Mr. Cleary who denied that the fee arrangement had been changed from his original letter outlining our hourly fee charges. Mr. Clearly expressly denied there was a contingency fee arrangement with Mr. Bithell.

7. On January 26, 1994 at Larco's Restaurant in Troy, Michigan, during a lunch meeting with Robert Cleary, I asked Mr. Cleary whether he had ever, at any time, assured Mr. Bithell that K&R would participate in a ⅓ contingency fee arrangement with Mr. Bithell for payment of K&R's fees for its services on behalf of Plaintiffs . . . .

8. Mr. Cleary directly replied to my question by assuring me that he had not at any time entered into such an arrangement with the Plaintiffs or with Mr. Bithell on behalf of the Plaintiffs.

9. As is stated on Page 3 of Mr. Bithell's Brief in Support of his Objections [to the motion to withdraw], Mr. Cleary began monthly bills for K&R's services in July 1991, continuing to bill monthly for one year until August 1992. Billings were then sporadically sent until October 1993, when Mr. Cleary again began billing Mr. Bithell for K&R services monthly. No possible reason exists for these monthly bills except that Mr. Cleary believed K&R had an agreement for payment of its fees.

10. Mr. Cleary recently left K&R to become employed by The Taubman Company, and to the best of my knowledge, he is directly responsible to Mr. Bithell at that Company.

11. I have read the affidavit of Robert Cleary and state emphatically to this Court that the contents thereof relating to an alleged contingency fee arrangement with the Bithells regarding this litigation is contrary to what he had repeatedly told me. Further, I am the managing officer of K&R and it is the express policy of this law firm that any contingency fee arrangement must be approved by either a meeting of the Board of Directors of this law firm or myself and must be in writing. Mr. Cleary was well-aware of this policy. Neither our Board of Directors nor I approved of any contingency fee arrangement for this matter until December 15, 1993 at a monthly meeting of our Board of Directors where I was authorized to negotiate an acceptable contingency fee arrangement with Mr. Bithell. I have never entered into such an arrangement with Mr. Bithell. When it became apparent to me that Mr. Bithell and I would not reach agreement on a contingency fee, I delegated my authority to Jimm F. White.

Evidently, K&R wanted the Bithells to sign a release of some sort in return for the contingent fee agreement, but the Bithells refused.

Following a hearing, Judge Schnelz entered an order indicating that he had read all the materials submitted in support of and objecting to the motion to withdraw. Judge Schnelz granted the motion and

stayed the proceedings to allow the Bithells to acquire new representation.

In 1997, Keywell informed his firm that he was leaving to take advantage of a business opportunity. The other partners decided to dissolve the law firm and divide its assets, appointing Keywell, who had long functioned as one of the firm's managers, as the person responsible for disposing of the firm's assets. The firm then attempted to collect all outstanding debts. The Bithells had paid almost all the costs K&R had advanced for them. However, because the Bithells had never paid their outstanding bill of $414,726.85 for the attorney fees from the four matters K&R had handled for them, K&R brought this collection action. K&R sought to recover under breach of contract, quantum meruit, account stated, and unjust enrichment theories.

### C. TRIAL

Though the parties at trial delved into the reasonableness of K&R's billing, two issues the Bithells raised as defenses dominated the trial: whether K&R and the Bithells had entered into a contingent fee agreement and whether their withdrawal from the underlying easement action had been proper. As the motion to withdraw and related documents suggested, the firm and the Bithells did not part company amicably. Not surprisingly, the two sides in this case presented very different versions of how the firm and the clients reached that point. What may be surprising, however, is that at trial Cleary presented a third perspective on the fee arrangement between the Bithells and K&R.

According to Keywell, Benham, Parson, and other K&R attorneys, though not written, K&R had a policy requiring contingent fee agreements to be approved by most, if not all, the partners, usually at a meeting, and then placed in writing with the clients. Though Keywell personally owned about eighty percent of the firm, he typically chose to exercise only a single vote in this sort of matter. Thus, it was important for attorneys who wanted to take a contingency case to secure broad support from the other partners as well as Keywell.

K&R's policy of obtaining contingent fee agreements in writing stemmed from a period when the firm had lost considerable money on cases with contingent fee agreements. In any event, Keywell and other firm lawyers said, the court rules required contingent fee agreements to be in writing. They did not recall approving a contingent fee agreement for the Bithells, and had been worried as the bills mounted but remained unpaid. Parson said that, as the attorney principally in charge of the case, she would have known if there had been a contingent fee agreement, but Cleary and the Bithells never mentioned that one existed. Further, it was undisputed that the Bithells' alleged contingent fee agreement was never rendered in writing.

Judith Robinson, the K&R office manager in charge of billing, also explained that she recorded all the hours K&R attorneys worked for the Bithells because she believed that the Bithells were paying the standard hourly fees as well as costs. She approached Cleary several times when he was not approving bills for the Bithells, but he never mentioned a contingent fee agreement. Had there been a contingent fee agree-

ment in place, she would have handled the billing differently. She added that, even if K&R expected to be compensated for its attorney fees as part of a settlement or the result of a trial, she still would have handled the billing differently because the work in progress reports would have been sufficient proof of the time spent on the case. Her testimony revealed, as Keywell had suggested in his affidavit, that Cleary continued to approve bills for hourly rates even *after* he supposedly agreed to a contingent fee agreement with the Bithells. Benham added that the Bithells had assured her that they would pay their fees, and she had never heard of a contingent fee agreement with the Bithells.

K&R also emphasized that the simple easement action that it had agreed to take quickly added a personal injury component, which was not the sort of work K&R typically handled, and grew into four separate actions. As Parson and Benham explained it, the firm had to hire a number of experts and pay for testing to prove that the sewage was coming from the Club and was causing Bithell's health problems. Parson added that Bithell took a very hands-on approach to this case, becoming involved at every step. Perhaps drawing from his own management experience at Taubman, Bithell asked for new people to work on the case a number of times, which increased costs because of the time it took to acquaint the new attorneys with the progress in the cases. Still, Benham said, when she moved on to other work she always remained available to the attorneys working on the underlying action. Further, K&R attorneys noted, the case had always had a relatively high price tag. The demand letter initially sent to the Club indicated that

the Bithells might be interested in settling for approximately $850,000, which later increased to $1.5 million.

K&R argued that it was entitled to withdraw as the Bithells' firm because the Bithells were so far in debt with respect to the hourly fees they owed the firm *and* the unpaid costs. As Bithell even admitted in a deposition in the underlying action used to impeach him at trial, he and his family "absolutely" owed the firm hundreds of thousands of dollars in fees. Other than occasional items, such as a charge for a long-distance telephone call that was less than eleven dollars, the Bithells never objected to the fees that K&R was charging while the firm represented them. Consequently, K&R claimed, even though it had not represented the Bithells through the end of the underlying action, it was entitled to collect the hourly fees that had accumulated throughout its representation or be given the reasonable value of its services to the Bithells under a quantum meruit theory.

To prove that their fees were reasonable, K&R presented testimony from John Scott, a partner at the Dickinson Wright law firm with almost forty years' experience as a lawyer and extensive familiarity with reviewing legal bills. Scott said that K&R had a good reputation, as confirmed by Martindale-Hubbell, that its fees were at or below the fees charged in the area by other firms of similar experience, and that the Bithells' case was very complex and time consuming. In his opinion, after considering all the criteria relevant to a proper fee identified in MRPC 1.5, K&R's fees were "very reasonable," not excessive. He explained that, in hindsight, it is always possible to question whether an attorney spent, perhaps, a little

too much time on a particular task or whether the bill might have been adjusted somehow, but that sort of reflection did not undermine the reasonableness of the fees charged in this case. At the very most, the fees would only overstate the reasonable value of K&R's services by ten percent. In any event, Scott said, K&R's work on the case had benefited the attorneys who had taken over the case.

The Bithells claimed that they did not agree to the hourly fee agreement outlined in Cleary's initial litigation plan. Though they had apparently agreed to pay on an hourly basis at the outset, at some point Cleary told them that their case would cost no more than $50,000, *including* fees and costs. So, when the fees and costs in this case exceeded $50,000, the Bithells did not think that they had to pay any more money; they thought the remainder would come from a settlement or trial, which would award those fees and costs as part of damages. Despite his business acumen, he thought that most expenses associated with litigation were generated at the beginning of the process and was surprised when the fees owed kept growing.

Later, Bithell said, Cleary convinced him and his wife to enter into a contingent fee agreement. Under the agreement, K&R would only be paid if the Bithells recovered in a settlement at trial. In that event, K&R would be entitled to one-third of the recovery or its actual fees—whichever was less. In other words, the Bithells said that K&R had agreed to allow them to pay under the scheme most favorable to them if they recovered. This meant that K&R might not recover at all, or that it would recover less than its fees depending on the size of the Bithells' award. Though Gary

Klotz, a K&R partner, did not recall the contingent fee agreement in exactly these terms, he remembered Cleary telling him that he had offered the Bithells a contingent fee agreement. Klotz and Miriam Rosen, who had been an associate for most her time at K&R, added that they were not aware of a hard and fast policy requiring partner approval of contingent fee agreements, though neither attorney had worked on the Bithells' cases.

The Bithells had not complained about their attorneys while K&R was representing them. They said that they even liked Benham and Cleary. However, they did not like Parson because she was aggressive, she allowed the defendants in the underlying action to inspect their personal belongings as part of discovery, and when she was late, she gave excuses for her tardiness that they did not believe. Shortly before trial, the Bithells also reviewed K&R's billing statements and found entries for which they thought that K&R was double billing or had spent too much time on a problem. Bithell also pointedly noted that, in the nine years between when K&R had filed the complaint in the underlying action and when this collection case went to trial, he and his family had yet to recover any money from the Club or Bloomfield Township.[3] The Bithells had recovered $150,000 in a settlement with the Oakland County Drain Commissioner, but K&R did not represent them at the time,

---

[3] This Court partially reversed the trial court's ruling in the underlying action, allowing the Bithells to sue Bloomfield Township under the trespass-nuisance exception to governmental immunity, one of the claims K&R had pleaded on their behalf. See *Bithell v Oakland Hills Country Club*, unpublished opinion per curiam of the Court of Appeals, issued March 7, 1997 (Docket No. 185106).

and about $100,000 from that settlement went to K&R for costs.

The Bithells also challenged the reasonableness of K&R's fees by introducing evidence from James Elsman. Elsman, an attorney with just slightly less than forty years' experience, is a sole practitioner who had previously practiced in a law firm. Put nicely, Elsman excoriated K&R and the firm's attorneys, with the exception of Keywell himself. Though Keywell had described the firm's attorneys as competent and experienced, and each attorney had described their own credentials, Elsman said that K&R's attorneys were not at the top of their field, having not come from Ivy League law schools. Elsman determined this by consulting the Martindale-Hubbell directory. However, Elsman said that it was irrelevant that Martindale-Hubbell had given Benham its top rating because Martindale-Hubbell was a "corporate buyout," evidently meaning that the rating could be purchased and did not have to be earned. Elsman also called Parson a "job jumper," referring to the fact that she had worked at other firms before joining K&R, and then left K&R because of personality conflicts with other attorneys. He asserted that Benham had just dropped the case, suggesting that she should not have transferred it to Parson. Elsman also challenged the complaint filed in the primary underlying case as having adopted a "shot gun approach," incorporating all possible claims, most of which were meritless.

Elsman emphasized that contingent fee agreements were common for personal injury actions, like the underlying case. Looking at the bills, he concluded that the case was being handled on a contingent fee

basis. Elsman said that, on the one hand, the underlying case was so simple it never should have taken as many hours as K&R attorneys put into it, but that it was also sufficiently complex that K&R and its attorneys were not competent to handle the whole case. Despite Elsman's characterization of the case as a personal injury action, he nevertheless said that K&R had spent too much time and money on the case because it was a property action involving a house worth only about $220,000. He said that it was also unethical for K&R to bill for "filthy lucre," apparently insinuating that K&R had no legitimate interest in being paid for the services it rendered. Elsman also disagreed that it was Judge Schnelz's right or responsibility to determine whether K&R could withdraw.

Cleary said that the fee agreement in the litigation plan reflected the agreement he and the Bithells had originally entered into concerning fees. He had never promised the Bithells to limit costs and fees to $50,000. Rather, he had tried to estimate costs, not fees, and did not anticipate how difficult the case became. Cleary was not sure that K&R had a definite policy mandating approval for cases taken on a contingent fee basis. However, when Bithell indicated to him that the family did not have the money to pay the fees, Cleary said he spoke to other members of the firm and had offered the Bithells a contingent fee agreement. The contingent fee agreement, though not in writing, would have allowed K&R to collect its fees or one-third of the net recovery, not the lesser of the two amounts. The contingent fee agreement did not alter the Bithells' obligation to continue to pay costs. Cleary asserted that, though various partners had come to him to discuss how to get the Bithells to pay

their bills, they should have known a contingent fee agreement was in place precisely because the Bithells had not paid for such a long time.

After the parties rested, the Bithells' attorney argued that the trial court should grant their motion "to dismiss the claim for unjust enrichment for the reason that the allegation is that there is a contract; and it's the defense position . . . [that] if there's an existence of the contract, there's no unjust enrichment recovery." K&R's attorney responded that she thought that it was "appropriate that if the services were performed and there was a benefit to the [Bithells] . . . that the plaintiffs [K&R] are entitled to be under equitable principles paid for the benefit to the defendant [the Bithells]." The trial court, however, said, "All right, I'll determine this to be a nonjury matter instead of granting your motion. I've heard all the evidence. The Court rules in defendant's [sic] favor."

The Bithells' attorney then argued, "Your Honor, the second motion is to dismiss the claim for account stated. There has been no evidence that the parties agreed to the amount that's allegedly owing, and that's [a] requirement for the consolidated action." K&R's attorney countered that

[a]n account claim under Michigan law can be supported by a failure to object. And I believe the substantial proofs have been put on that monthly invoices were sent and there was a failure to reject [sic]. And for that reason, I think that the accounts stated claim[s] are extremely viable.

The trial court rejected this argument, commenting: "I would state that even considering the case in the light most favorable to the plaintiff, reasonable minds could not differ, taking into consideration all the

overwhelming evidence in this case in favor of defendant on that issue or those issues; and, therefore, would grant the defense's motion." Thus, the trial court granted the Bithells' motions for directed verdict concerning the firm's account stated and unjust enrichment claims.

Following the parties' closing arguments, the trial court summarized the theories of recovery in its instructions to the jury:

> First main issue is whether it's a written contract orally agreed to by the party [the Bithells]; and then as the initial litigation [plan] under which the plaintiff [K&R] is seeking to recover attorney fees on an hourly basis. The burden of proof on that issue is on the plaintiff. Defendant denied the terms of that contract and claims it was limited to a total of $50,00 [sic] on both expenses and hourly rate fee.

> Second main issue in the case is whether the parties entered into a Contingent Fee Contract. The burden of proof on this issue is on the defendant. Plaintiff denied this, claiming that the contract was never changed, and that there is neither any actual authority for the going [sic: billing] attorney to change it on his own or any apparent [authority for him to do so].

> The third main issue is whether the plaintiff improperly withdrew from the lawsuit as the lawyer for the defendant. The burden of proof on this issue is on the defendants.

> If there was either an hourly fee contract or a contingent fee contract and the plaintiff properly withdrew from the lawsuit, then the plaintiff is still entitled to be paid for the reasonable value of its legal services up to that date . . . .

> \*    \*    \*

> And the final point in the main issue is, if there was a Contingent Fee Contract in this case and if the plaintiff law firm improperly withdrew from the lawsuit, then the plaintiff law firm is not entitled to any amount.

The trial court explained these theories again, saying that if the jury found

> that there was an hourly fee agreement, then you find that there was a subsequent Contingent Fee Agreement; and if you find that it was intended to replace the earlier hourly fee agreement, then the original hourly fee agreement is no longer binding.
>
> If you find there is no contract in this case, then plaintiff is only entitled to the reasonable value of the services rendered. The parties have used testimony contending to show the value of the services rendered by the plaintiff.
>
> If you find there is no contract, you can award fees on a Quantum Meruit basis. Also, if you find that the plaintiff properly withdrew and there was a contract, whether it be a contingent fee contract or hourly fee contract, then the plaintiff may still be able to recover on a Quantum Meruit pay basis.
>
> What do those Latin words mean? It means an amount of recovery as much as deserved. It is an equitable principle that measures recovery under an implied contract to pay compensation as reasonable value of services rendered. I can only give you a list of the factors; but among the factors to consider is what percentage of total work has been completed by the attorney or attorneys seeking fees to obtain results of the parties.
>
> All right. If you find that a fee agreement existed between the plaintiff and the defendants, you must decide the reasonableness of the legal services fee charged.

The trial court then informed the jury that attorneys must follow the rules of professional conduct and instructed the jury consistent with MRPC 1.5, the rule governing reasonable fees. In all, under the trial court's instructions, the jury had to return an award for K&R unless it found that there was (1) a contingent fee agreement and the firm withdrew improperly

or (2) that the firm's services had no reasonable value.

K&R made several objections to the jury instructions. However, the firm's chief objection was that the trial court had failed to read SJI2d 3.13 to the jury, which would have informed the jurors that the trial court had taken notice of Judge Schnelz's order granting the motion for K&R to withdraw from the underlying case. In effect, if the jury found that the Bithells and K&R had a contingent fee agreement, this instruction would have barred the jury from determining that the firm withdrew wrongfully. However, the trial court's refusal to issue this instruction was consistent with its ruling on the first day of trial that whether the firm had withdrawn was a disputed factual matter, and therefore a jury question.

According to K&R, at some point after being sent to deliberate, the jury submitted a note to the trial court "requesting an instruction as to the circumstances under which a lawyer or law firm could properly withdraw."[4] The trial court did not, however, issue any supplemental instructions to the jury. Pursuant to the parties' stipulation, the trial court did not submit a verdict form to the jury. Rather, the six-person jury announced the verdict on the record. Five of the six jurors voted in favor of the Bithells, meaning that K&R recovered nothing.

---

[4] We could not find the note in the lower court record, and the transcripts do not reflect that the attorneys and the trial court ever discussed any such note. The Bithells, however, do not contest K&R's factual assertions concerning this note. Thus, we assume that the jury actually sent this note to the trial court.

II. DIRECTED VERDICT

A. STANDARD OF REVIEW

K&R now claims that the trial court erred in two ways when it dismissed the unjust enrichment and account stated claims. First, the firm contends that the trial court improperly granted two motions to "dismiss," which MCR 2.504(B)(2) permits only in a bench trial, not in a jury trial such as this case. Second, K&R argues that the trial court erred substantively in deciding that there was no dispute on the record concerning the unjust enrichment or account stated claims. This Court reviews de novo a trial court's decision to grant or deny a motion for a directed verdict.[5]

B. DISMISSAL

There is no merit in K&R's first contention. MCR 2.504(B)(2) permits a defendant in a bench trial to move for dismissal after the plaintiff's case in chief. Yet, even assuming that there is no possible basis in the court rules for a "motion to dismiss" once a party has begun presenting evidence to a jury, the Bithells' attorney, not the trial court, used the motion to dismiss language.

More importantly, had the trial court erroneously referred to a motion to dismiss, appellate courts often look to the substance of a motion or ruling to determine its true nature, not its label.[6] In this case, the

---

[5] See *Meagher v Wayne State Univ*, 222 Mich App 700, 708; 565 NW2d 401 (1997).

[6] See *Wickens v Oakwood Healthcare Sys*, 465 Mich 53, 59; 631 NW2d 686 (2001).

trial court plainly treated the so-called motion to dismiss as a motion for a directed verdict. In contrast to the rule governing motions to dismiss, MCR 2.515 does not distinguish between jury and bench trials. Thus, the trial court did not technically err in considering whether there was sufficient proof of K&R's account stated and unjust enrichment claims to submit to a jury.

### C. UNJUST ENRICHMENT AND ACCOUNT STATED

The heart of this issue is whether the unjust enrichment and account stated claims should have been submitted to the jury. Trial courts and this Court adopt the same analysis when examining whether there are grounds to grant a motion for a directed verdict.[7] The relevant inquiry examines "the evidence presented up to the time of the motion in the light most favorable to the nonmoving party, granting that party every reasonable inference, and resolving any conflict in the evidence in that party's favor to decide whether a question of fact existed."[8] "A directed verdict is appropriate only when no factual question exists on which reasonable jurors could differ."[9]

In *Barber v SMH (US), Inc*,[10] this Court explained unjust enrichment is "(1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant." When unjust enrichment

---

[7] See *Meagher, supra* at 708.

[8] *Derbabian v S&C Snowplowing, Inc*, 249 Mich App 695, 703; 644 NW2d 779 (2002).

[9] *Id.*

[10] *Barber v SMH (US), Inc*, 202 Mich App 366, 375; 509 NW2d 791 (1993).

exists, "the law operates to imply a contract in order to prevent" it.[11] However, a contract will be implied only if there is no express contract covering the same subject matter.[12]

The Bithells' attorney contended that this equitable doctrine could not apply in this case because the firm was arguing that there was an express contract between K&R and the Bithells. In fact, K&R pleaded inconsistent claims. The firm's breach of contract and quantum meruit claims depended on the jury finding that a contract, either an hourly fee agreement or a contingent fee agreement, existed. In contrast, the firm's claim for unjust enrichment depended on the jury finding that no express contract—that is, no fee agreement—existed between K&R and the Bithells. MCR 2.111(A)(2) permitted K&R to make these inconsistent claims.

There were two distinct ways the jury could have found that K&R and the Bithells had no express contract concerning the fees, and therefore an implied contract existed. First, the trial court instructed the jury on the elements of a contract, informing the jury that K&R had "to prove the terms of the contract." The evidence, however, varied widely concerning what express contract, if any, the parties had and what its terms might have been. The testimony suggested that the contract could have consisted of the terms identified in the initial litigation plan, those terms without the retainer or five percent contingency, the contingent fee agreement under which the Bithells would pay the lesser of one-third of a recov-

[11] *Id.*
[12] *Id.*

ery or fees, the contingent fee agreement under which the Bithells would have paid the greater amount of one-third of a recovery or fees, or some variation on the alleged $50,000 cap. Considering these very different possible fee agreements, the jury could have easily found that the parties never agreed on terms for the fee arrangement, and therefore did not have a contract.[13] Second, the jury could have found that the parties had originally agreed to abide by the terms stated in the initial litigation plan, but that agreement "was no longer in effect" after the Bithells were unable to pay, and was not replaced by a new agreement.[14]

Under the first example, K&R could have recovered under the unjust enrichment theory for its entire representation of the Bithells.[15] Under the second example, K&R "could have recovered for breach of contract for the period when the contract was in force and could have recovered on an implied contract [unjust enrichment] basis for the period when there was no contract in force."[16] In any event, the evidence would have allowed the jury to find an implied contract for at least some of K&R's work for the Bithells, which means that the trial court should have examined whether the record included evidence of the two elements of an unjust enrichment claim: benefit to the Bithells' from K&R's work, and an injustice

---

[13] See *HJ Tucker & Assoc, Inc v Allied Chucker & Engineering Co*, 234 Mich App 550, 573-574; 595 NW2d 176 (1999).

[14] *Id.* at 573.

[15] *Id.* at 573-574.

[16] *Id.* at 573.

in allowing the Bithells' to enjoy that benefit without paying K&R for its services.[17]

The evidence suggested that, even if the Bithells might reasonably object to some of the fees K&R charged, the firm performed significant amounts of work in the pretrial preparation of the underlying action. There was a minor dispute at trial about whether the firm gave its files to the Bithells and their new counsel, or whether the firm only had duplicates of materials the Bithells already possessed. In any event, the firm filed pleadings and motions, took depositions, secured experts, arranged for scientific testing, appeared at hearings, attempted to negotiate a settlement, and generally shepherded the case for three years. Elsman disagreed on this point, but Scott specifically said that this preparation was of value to the lawyers who took over the case from K&R, and therefore of value to the Bithells. The Bithells certainly disputed the proposition that it would be inequitable to leave K&R unpaid. However, the magnitude of the undertaking on behalf of the Bithells, which the K&R attorneys described for the jury, including all four legal matters, suggests that equity would require the firm to be compensated at some level. Viewing this conflicting evidence in the light most favorable to the firm as the nonmovant, the trial court erred in granting a directed verdict on this issue.[18]

As for the trial court's decision to direct a verdict of no cause of action for the account stated claim, in

---

[17] See *Barber, supra* at 375.

[18] See *Derbabian, supra.*

*Watkins v Ford*[19] the Michigan Supreme Court agreed with the articulation of an account stated as "a balance struck between the parties on a settlement . . . ." "[W]here a plaintiff is able to show that the mutual dealings which have occurred between two parties have been adjusted, settled, and a balance struck, the law implies a promise to pay that balance."[20] In order to demonstrate that its fees for its services to the Bithells had become an account stated, K&R had to prove that the Bithells either expressly accepted the bills by paying them or failed to object to them within a reasonable time.[21] Proving an account stated " 'must depend upon the facts. That it has taken place, may appear by evidence of an express understanding, or of words and acts, and the necessary and proper inferences from them.' "[22]

K&R presented evidence that, with the exception of a nine- or ten-month period, it regularly sent bills to the Bithells stating the costs incurred on behalf of the family in the underlying litigation, as well as the fees for the firm's services. The Bithells paid the bills, although never fully or in sufficient amount to be applied to the fees, without objection until they reached the $50,000 limit they felt applied to the case. After that point, in the fall of 1991, and even after K&R withdrew, the Bithells continued, at least spo-

---

[19] *Watkins v Ford*, 69 Mich 357, 361; 37 NW 300 (1888).

[20] *Id.*

[21] See *Corey v Jaroch*, 229 Mich 313, 315; 200 NW 957 (1924) ("When an account is stated in writing by the creditor and accepted as correct by the debtor, either by payments thereon without demur or by failure within a reasonable time to question the state of the account as presented, it becomes an account stated . . . .").

[22] *Kaunitz v Wheeler*, 344 Mich 181, 185; 73 NW2d 263 (1955), quoting *White v Campbell*, 25 Mich 463, 468 (1872).

radically, to pay the costs that the firm had incurred on their behalf. With the exception of a few items listed on the bills, the Bithells never objected to the fees that the firm listed in the bills. In his deposition in the underlying action, which evidently took place a year before K&R withdrew and which the jury learned of at trial, Bithell even stated that he "absolutely" owed (at the time) approximately $250,000 to K&R, and that sum was not subject to any contingencies. Irene Bithell also wrote a note with one check referring to "our agreement." Only after the firm sued the Bithells to collect the unpaid fees, *seven years* after K&R first started representing them, did the Bithells object to the fees. At trial, though they claimed that some of the work Benham, Parson, and others performed was duplicative and inefficient, they did not object to all the fees. According to K&R's calculations, in their exhibit objecting to the firm's bills line-by-line, the Bithells still did not object to more than $274,000 in fees the firm had charged them.

In all, this record suggests that there was at least a dispute regarding whether K&R had proved its account stated claim after demonstrating that the Bithells failed to object for years to virtually any of the bills and had explicitly conceded some of them. The Bithells were entitled to challenge the firm's right to recover certain items listed in the bills.[23] However, the trial court erred in not allowing the jury to determine this issue as a whole because, giving K&R the benefit of all reasonable doubts, there was a dispute of fact concerning whether there was an account

---

[23] See *Kaunitz, supra* at 185, quoting *White, supra* at 468 ("When [an account stated is] accomplished, it does not necessarily exclude all inquiry into the rectitude of the account.").

stated.[24] Thus, K&R is entitled to a new trial on its account stated and unjust enrichment claims.

### III. EVIDENTIARY ISSUES

#### A. STANDARD OF REVIEW

K&R challenges a number of pieces of evidence admitted at trial. This Court applies the abuse of discretion standard of review to evidentiary issues.[25]

#### B. HEARSAY

K&R argues that the trial court erred when it allowed Klotz, a former K&R partner, and Rosen, a former K&R associate and partner, to testify that Cleary told them that the firm had a contingent fee agreement with the Bithells. K&R argues that the trial court should not have allowed them to testify because they were not involved in representing the Bithells, they did not participate in the fee agreement discussions with the Bithells, and they had no personal knowledge of any fee agreement with the Bithells. These arguments, however, only lay the foundation for K&R's real argument that Klotz' and Rosen's recollections of Cleary's statements regarding the Bithells were not admissible under MRE 801(d)(2).

MRE 802 states that "[h]earsay is not admissible except as provided by these rules." MRE 801 defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing,

---

[24] See *Derbabian, supra.*

[25] See *Hilgendorf v St John Hosp & Medical Ctr Corp*, 245 Mich App 670, 688; 630 NW2d 356 (2001).

offered in evidence to prove the truth of the matter asserted." As K&R points out, Klotz and Rosen had no personal knowledge of any fee agreement between the firm and the Bithells. They simply were repeating information that Cleary had given them, which fits this definition of hearsay. However, MRE 801(d) identifies certain types of statements that are not hearsay. In particular, MRE 801(d)(2) indicates that a statement is not hearsay, and therefore not excludable under MRE 802, if

> [t]he statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity, except statements made in connection with a guilty plea to a misdemeanor motor vehicle violation or an admission of responsibility for a civil infraction under laws pertaining to motor vehicles, or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy on independent proof of the conspiracy.

Klotz' and Rosen's testimony concerning Cleary's statements that there was a contingent fee agreement with the Bithells fit the first part of this rule because the Bithells offered this testimony *against* K&R, their party-opponent. Their repetition of Cleary's statements likely fit subsection A because Cleary, at the time he made the statements, was a partner in K&R. Cleary's statement also likely fit subsection D because he was the billing partner for the Bithells, and thus making statements about billing was conceivably

within the scope of his duties at K&R even if he would not be considered a party-opponent at the time of trial. Nothing in this rule required Klotz or Rosen to have personal knowledge of the Bithells' fee agreement with the firm or the date on which Cleary made the statements in order to repeat them, as K&R contends. Though K&R claims that MRE 801(d)(2) was not intended to apply in this case because Cleary was simply talking to other members or employees of the firm, it concedes that it has no authority for this proposition. Even if it was error for the Bithells to be allowed to introduce Cleary's out-of-court statements through Rosen and Klotz, the error was harmless because these statements did not establish anything more than what he said when testifying at trial.

K&R also claims that the trial court erred because it applied MRE 801(d)(2) inconsistently, allowing these statements from Cleary but barring testimony from Keywell and other K&R attorneys who tried to repeat Cleary's statements regarding the fee agreement. For instance, K&R asked Keywell to repeat Cleary's "response" in meetings when they had discussed the Bithells' fees. When the Bithells' attorney objected, the trial court sustained the objection. Despite the confusion regarding Cleary's loyalty to the firm, Taubman, and Bithell, he was never K&R's party-opponent. Though the trial court did not explain its ruling, this and other similar testimony did not truly fit MRE 801(d)(2), but was an improper attempt to impeach Cleary with extrinsic evidence.[26] Therefore, the trial court did not err in excluding K&R's attempts to introduce Cleary's out-of-court statements when it

---

[26] See MRE 608(b).

permitted the Bithells to introduce other statements by Cleary.

K&R also argues that the trial court should have barred Rosen from testifying about her awareness and "understanding" of the fee agreement with the Bithells because she could not recall with whom at the firm she had discussed the matter. This fogginess about details, however, was relevant only to the weight of her testimony, not its admissibility.[27] This constituted her personal knowledge of the debate within the firm of what to do about the Bithells' outstanding bill. This testimony vaguely referred to other discussions without revealing any detailed statements made in the discussions, which, in any event, would have been admissible under MRE 801(d)(2) for the reasons previously explained.

### C. ELSMAN

Before trial, the trial court entered an order stating that "Mr. Elsman is not to testify to anyone's personal lives or gossip that he may have heard about someone's personal life. Defendants are cautioned that Mr. Elsman is not to offer opinions at trial which is [sic] not supported." At trial, Elsman prompted K&R's attorney to object when he testified that whether the case was a fixed or contingent fee matter was important to his opinion that the fees were unreasonable, explaining:

> Obviously we don't have a fixed fee here. Nobody said, except for one early reference, that the cap on this was

---

[27] See, generally, *McPeak v McPeak (On Remand)*, 233 Mich App 483, 496; 593 NW2d 180 (1999) (evidence with little weight is not necessarily inadmissible).

going to be fifty grand. And that's all I've read from the testimony so far. But, you know, cost[s] alone are three times that; so we're a little bit beyond analysis of anybody speculating like that. And the case is clearly a contingent fee case. I mean when you have, as I understand the testimony from—I just read the deposition. And the jury's been here to hear people, and I don't know what they said because I wasn't here. *But when a man with the role of Cleary on this file is before you and says, this is a contingent fee case, one-third, that ends the case. You might as well just close it up and decide the case on that basis; because he was the billing . . . partner dealing with the client.*[28]

The Bithells' attorney said that this testimony was proper because he was supposed to consider this "factor," referring obliquely to MRPC 1.5(a)(8), when evaluating whether K&R's fee was reasonable. The trial court overruled the objection, saying that Scott had testified as an expert on behalf of K&R, so it was fine for the Bithells to have their own expert and that he "can be asked for his opinions." Elsman then proceeded to testify:

Contingent fee is what I'm talking about. Cleary found it [to] be contingent and specifically one-third of any amount recovered. Nothing was recovered; therefore, there's zero benefit. And I understand that there was another member of the law firm that came here [Klotz] . . . and backed Cleary up saying, yeah, I knew it was a contingent fee. And Klotz stood to profit five percent from anything that's recovered, so he obviously was motivated to shoot straight because he's going to be hurt, with what my conclusion is, a zero result that the fee was contingent. The Keywell firm is not entitled to one penny, and they're sitting on $150,0000 of costs that have been reimbursed, roughly speaking. Maybe its 145 or whatever, I'm not here to quibble about

---

28 Emphasis added.

> those costs; rather [sic] they're accurate puffed up or what.
> I just don't want to get into that ethically if I don't have to.

K&R claims that Elsman improperly assessed the witnesses' credibility. It is partially correct. MRPC 1.5(a)(8) says that one of the factors relevant to whether a fee is reasonable is whether the fee "is fixed or contingent." When Elsman said that he considered Cleary's statement that there was a contingent fee agreement, he was describing how he arrived at the conclusion that the Bithells had a contingent fee agreement. As an expert called to testify about the reasonableness of K&R's fees, this was proper. Elsman walked a very narrow line when he told the jury that Klotz had corroborated Cleary's testimony. This, too, was relevant to whether a contingent fee agreement existed even though it tended to bolster Cleary's credibility.

However, Elsman invaded the jury's province when he commented on Klotz' motivation to tell the truth. Whether the pretrial order limiting Elsman's testimony prohibited these specific statements is not clear. Nevertheless, as K&R notes, MRE 702 permits expert testimony when it "will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." Elsman as an attorney had no "specialized knowledge"[29] of Klotz' credibility. The jury and Elsman were equal in their abilities to determine whether Klotz was telling the truth, and therefore this was not a proper subject for Elsman's expert testimony.[30] Consequently, this testimony was inadmissi-

[29] MRE 702.
[30] See *People v Beckley*, 434 Mich 691, 727-728; 456 NW2d 391 (1990) (BRICKLEY, J.).

ble, and may not be admitted in a new trial on remand.

## IV. JURY INSTRUCTIONS

### A. STANDARD OF REVIEW

K&R challenges the trial court's instructions to the jury in several respects. "[C]laims of instructional error" are subject to review de novo.[31] However, to the extent that a trial court must determine whether the evidence supports the instruction, the trial court is entitled to some deference.[32]

### B. INSTRUCTIONS GENERALLY

This Court explained the relevant legal standard for assessing jury instructions in *Burnett v Bruner*,[33] saying that, in examining the instructions given the Court views "the jury instructions as a whole to determine whether the trial court committed error requiring reversal." This Court "will reverse for instructional error only where failure to do so would be inconsistent with substantial justice."[34] Additionally, "[j]ury instructions 'should include all the elements of the plaintiff's claims and should not omit material issues, defenses, or theories if the evidence supports them.' "[35]

---

[31] See *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000).

[32] See *Isagholian v Transamerica Ins Corp*, 208 Mich App 9, 16; 527 NW2d 13 (1994).

[33] *Burnett v Bruner*, 247 Mich App 365, 375; 636 NW2d 773 (2001).

[34] *Id.*

[35] *Id.*, quoting *Case, supra* at 6.

## C. JUDICIAL NOTICE

K&R asked the trial court to give SJI2d 3.13,[36] an instruction entitled "Fact Judicially Noticed," which simply states, "In this case, you [the jury] must accept it as fact that _____." Under the blank, in parentheses, SJI2d 3.13 informs the trial court to "[i]dentify fact judicially noticed." K&R wanted the trial court to inform the jury that Judge Schnelz had issued the order permitting the firm to withdraw from representing the Bithells. In other words, K&R wanted the trial court to inform the jury that it should accept as fact that the firm had withdrawn properly from the underlying action. At issue was K&R's argument, which the trial court had rejected, that collateral estoppel barred the Bithells from relitigating this issue because Judge Schnelz had already decided that it was proper for the firm to withdraw from the underlying action.

As this Court explained in *Porter v Royal Oak*,[37] the doctrine of collateral estoppel prevents "relitigation of an issue in a subsequent, different cause of action between the same parties when the prior proceeding culminated in a valid final judgment and the issue was actually and necessarily determined in the prior proceeding." This doctrine is strictly applied in that "[t]he issues [in both cases] must be identical, and not merely similar . . . ."[38] The previous litigation must have presented a "full and fair" opportunity to litigate the issue presented in the subsequent case.[39] Further-

---

[36] Now M Civ JI 3.13.

[37] *Porter v Royal Oak*, 214 Mich App 478, 485; 542 NW2d 905 (1995).

[38] *Eaton Co Bd of Co Rd Comm'rs v Schultz*, 205 Mich App 371, 376; 521 NW2d 847 (1994).

[39] *Arim v Gen Motors Corp*, 206 Mich App 178, 194-195; 520 NW2d 695 (1994).

more, collateral estoppel includes an element of mutuality, requiring the previous litigation of the issue to have had a preclusive effect on the party asserting collateral estoppel as a defense.[40] By preventing relitigation, this doctrine attempts "to relieve parties of multiple litigation, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication."[41]

When moving to withdraw from its representation of the Bithells in the underlying action, K&R articulated appropriate grounds for withdrawal. As MRPC 1.16(b) indicates, unless ordered to continue to represent a client, an attorney[42] "may withdraw from representing a client if withdrawal can be accomplished without material adverse effect on the interests of the client," "the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client,"[43] or if "other good cause for withdrawal exists."[44]

K&R alleged that its withdrawal would not harm the Bithells because Wulfmeier remained their attorney and that it was otherwise entitled to withdraw because the Bithells had not paid their fees or costs, amounting to an unreasonable financial burden. The Bithells, of course, disputed K&R's allegations. Judge Schnelz, thus, had a full opportunity to address the very issue that the Bithells asserted as an affirmative defense in this case, namely whether the firm had

---

[40] *Lichon v American Universal Ins Co*, 435 Mich 408, 427-428; 459 NW2d 288 (1990).

[41] *Dearborn Heights School Dist No 7 v Wayne Co MEA/NEA*, 233 Mich App 120, 124; 592 NW2d 408 (1998).

[42] In this case, a firm. See MCR 2.117(B)(3)(b).

[43] MRPC 1.16(b)(5).

[44] MRPC 1.16(b)(6).

proper grounds to withdraw. Judge Schnelz, considering the affidavits and arguments, had to conclude that K&R had demonstrated the proper grounds for withdrawal in order for him to permit K&R to withdraw.

Substantively, this dispute over the motion to withdraw was the sort of full and fair opportunity to litigate an issue that collateral estoppel requires.[45] Further, this withdrawal issue raised in the underlying action was literally identical to the withdrawal question that the trial court submitted to the jury in this case.[46] Whether K&R withdrew improperly was an integral part of the Bithells' theory that they did not owe the firm anything for their services because there was a contingent fee agreement and the firm withdrew before the case was resolved.[47] Yet, the trial court expressly gave the jury permission to reexamine the facts surrounding K&R's withdrawal to determine for itself whether the withdrawal met the criteria in MRPC 1.16, even though Judge Schnelz had already determined that the firm had met those criteria. This is the sort of double litigation of a single issue and opportunity for inconsistent factual determinations that the collateral estoppel doctrine is supposed to prevent.[48]

Still, the Bithells have hit upon language describing the collateral estoppel doctrine that gives us reason

---

[45] See *Arim, supra* at 194-195.

[46] *Eaton Co Bd of Co Rd Comm'rs, supra* at 376.

[47] See *Plunkett & Cooney, PC v Capitol Bancorp, Ltd,* 212 Mich App 325, 329-330; 536 NW2d 886 (1995) ("Where an attorney's employment is prematurely terminated before completing services contracted for under a contingency fee agreement, the attorney is entitled to compensation for the reasonable value of his services on the basis of quantum meruit, and not on the basis of the contract, provided that his discharge was wrongful or his *withdrawal was for good cause.*") (emphasis added).

[48] See *Dearborn Heights, supra* at 124.

to pause before deciding whether collateral estoppel
barred the jury from considering this defense. As the
Bithells note, the case law explaining collateral estop-
pel refers to raising the issue in the "pleadings" and
having the first case result in a "final judgment."[49] Just
as the Bithells claim, MCR 2.110(A) defines a "plead-
ing" exclusively as "a complaint," "a cross-claim," "a
counterclaim," "a third-party complaint," "an answer
to a complaint, cross-claim, counterclaim, or third-
party complaint," and "a reply to an answer." Though
the court rules occasionally treat motions in the same
manner as pleadings,[50] technically, there is no ques-
tion that a motion falls outside the definition of a
pleading.[51] Nor did Judge Schnelz' order resolving this
motion to withdraw precisely fit the definition of a
final judgment because, in the underlying action, the
order permitting K&R to withdraw "adjudicated fewer
than all the claims" and failed to resolve the "rights
and liabilities" of all the parties, even though the
order signaled the complete end to K&R's representa-
tion of the Bithells in the case.[52]

---

[49] See *Ditmore v Michalik*, 244 Mich 569, 577; 625 NW2d 462 (2001)
("Collateral estoppel, or issue preclusion, precludes relitigation of an issue
in a subsequent, different cause of action between the same parties or
their privies when the prior proceeding culminated in a valid *final judg-
ment* and the issue was actually and necessarily determined in the prior
proceeding.") (emphasis added); *VanDeventer v Michigan Nat'l Bank*, 172
Mich App 456, 463; 432 NW2d 338 (1988) ("Collateral estoppel conclu-
sively bars only issues 'actually litigated' in the first action. A question has
not been actually litigated until *put into issue by the pleadings*, submitted
to the trier of fact for a determination, and thereafter determined.")
(emphasis added).

[50] See MCR 2.113(A).

[51] See, generally, *Huntington Woods v Ajax Paving Industries, Inc (On
Rehearing)*, 179 Mich App 600, 601; 446 NW2d 331 (1989) (applying plain
language in MCR 2.110[A] to conclude that motion for summary disposi-
tion was not a "pleading").

[52] See MCR 2.604(A).

Irrespective of whether these technical misfits between the collateral estoppel doctrine and the facts of this case would merit ignoring the duplicative nature of presenting the withdrawal question to the jury, they point to the true problem in this case: K&R was not a party to the underlying proceedings. *Porter* refers to applying collateral estoppel when the same *parties* participate in the first and subsequent actions.[53] Without the same parties in the first and subsequent action, mutuality of estoppel is difficult to prove.[54] K&R was not a party to the underlying action, at least not when looking at the formal pleadings rather than the narrow context of the motion to withdraw. K&R and the Bithells did not even occupy adverse interests in the underlying action.[55] Rather, the Bithells and K&R were aligned as clients and attorneys against defendants Bloomfield Township, the Club, and Korzon.

The court rules fail to provide a mechanism by which K&R and the Bithells could have become named opponents for the purpose of a dispute over whether to withdraw. K&R certainly could not file a separate civil action in the same circuit asking to withdraw because MCR 2.117(C)(2) instructs that "[a]n attorney who has entered an appearance may withdraw from the action or be substituted for *only*

---

[53] *Porter, supra* at 485.

[54] See, generally, *Minicuci v Scientific Data Mgt, Inc,* 243 Mich App 28, 37; 620 NW2d 657 (2000).

[55] Collateral estoppel does not require adversity, and we do not intend to suggest that we have incorporated adversity as an element of the doctrine. In this case, adversity is a useful analytical tool because it helps us focus on the identity of the "parties" to the previous action and whether those parties litigated the withdrawal issue fully.

*on order of the* court."[56] Logically, this court rule suggests that the judge presiding over the case has the authority to control whether an attorney, or in this case an entire law firm, can withdraw from representing a client. Indeed, because MRPC 1.16 sets out fact-based criteria that largely require a knowledge of the parties and attorneys, the judge presiding over the case has an important role in determining whether withdrawal is proper. A judge in a separate action would likely not have this insight, much less the authority to intervene in the other suit in order to allow the firm to withdraw. Consequently, K&R took the only steps available to withdraw from the underlying action, though those steps did not involve a formal "pleading" or "final judgment." In deciding whether the collateral estoppel doctrine tolerates the absence of a formal pleading and final judgment when an issue is very clearly being relitigated, we see a useful analogy in case law that stems from the criminal context.

The Sixth Amendment of the United States Constitution and Const 1963, art 1, § 20, both afford a criminal defendant the right to effective assistance of counsel.[57] Criminal defendants, if convicted, often claim to have been denied this right to effective assistance of counsel, though they face a difficult task in proving such a claim.[58] There are a small number of

---

[56] Emphasis added.

[57] See, generally, *People v Pickens*, 446 Mich 298, 308-309; 521 NW2d 797 (1994).

[58] See *People v Watkins*, 247 Mich App 14, 30; 634 NW2d 370 (2001) (With respect to a claim of ineffective assistance of counsel, "[t]his Court presumes that counsel's conduct fell within a wide range of reasonable professional assistance, and the defendant bears a heavy burden to overcome this presumption.").

cases in which criminal defendants, in addition to
seeking a remedy for the denial of this constitutional
right in the form of a new criminal trial, also seek
civil damages by suing their attorneys for malprac-
tice. The best known examples are *Barrow v Pritch-
ard*,[59] in which the defendant attorney and law firm in
the malpractice action represented the plaintiff in a
federal tax prosecution; *Schlumm v Terrence J
O'Hagan, PC*,[60] in which the defendant law firm in the
malpractice action had been hired to represent one of
the plaintiffs in a criminal sexual conduct pros-
ecution; and *Knoblauch v Kenyon*,[61] in which the
defendant attorney in the malpractice action had rep-
resented the plaintiff in state court prosecution for
criminal sexual conduct. In these cases, the former
clients who had been criminal defendants asserted
that the same conduct that constituted ineffective
assistance of counsel also constituted legal malprac-
tice.[62] In each malpractice case, the former attorney
asserted collateral estoppel as a defense.[63] Despite
any legal differences between ineffective assistance
of counsel and legal malpractice claims, this Court
applied the collateral estoppel doctrine, effectively
barring the malpractice claims in each case.[64] As this
Court explained in *Barrow*, "[T]he standards [for

---

[59] *Barrow v Pritchard*, 235 Mich App 478, 479; 597 NW2d 853 (1999).

[60] *Schlumm v Terrence J O'Hagan, PC*, 173 Mich App 345, 348-352; 433
NW2d 839 (1988).

[61] *Knoblauch v Kenyon*, 163 Mich App 712, 713-714; 415 NW2d 286
(1987).

[62] See *Barrow, supra* at 485; *Schlumm, supra* at 351-352; *Knoblauch,
supra* at 715.

[63] See *Barrow, supra* at 479; *Schlumm, supra* at 352; *Knoblauch, supra*
at 725.

[64] See *Barrow, supra* at 485; *Schlumm, supra* at 356; *Knoblauch, supra*
at 715.

legal malpractice and ineffective assistance of counsel] are sufficiently similar in substance to support the application of the defense of collateral estoppel."[65] Thus, once an appellate court has rejected an ineffective assistance of counsel claim in an appeal from the criminal prosecution,[66] or the trial court in the criminal prosecution rejects an ineffective assistance of counsel claim and the defendant does not appeal,[67] the criminal defendant may not challenge the attorney's conduct in a subsequent legal malpractice action.

This conclusion that collateral estoppel applies to a subsequent legal malpractice claim can be reached even though there was no formal pleadings between the parties in the underlying criminal prosecution and the criminal defendants and their attorneys were not adverse parties in the underlying criminal prosecution. This precedent suggests that there are times when the formalities surrounding a previous action bend to the unalterable reality that the parties have already disputed an issue to the fullest extent possible and the trial court deciding the previous dispute resolved the issue as formally as the court rules permit. As the Michigan Supreme Court has said:

> [L]ack of mutuality does not always preclude the application of collateral estoppel. There are several well-established exceptions to the mutuality requirement, such as when an indemnitor seeks to assert in its defense a judgment in favor of its indemnitee, or where a master defends by asserting a judgment for a servant. The Court of Appeals

[65] *Barrow, supra* at 484-485.

[66] See *Schlumm, supra* at 351; *Knoblauch, supra* at 714.

[67] See *Barrow, supra* at 479.

has [also] recognized that there may be other situations in which the mutuality requirement is relaxed. [68]

There are definite parallels between a criminal defendant who attempts to relitigate his attorney's conduct in the underlying criminal action when suing the attorney for malpractice and the Bithells' attempt to relitigate K&R's ability to withdraw in the trial in this case. In both cases, there have been definitive factual findings paired with the legal conclusions that flow from those findings. In neither example is it possible for the attorney and the client, in the underlying action, to have truly adverse interests, even if the client in both cases is ultimately displeased with the attorney's conduct. Neither the attorney in the criminal case nor K&R in the Bithells' civil suit against the Club, Bloomfield Township, and Korzon were named parties. Applying collateral estoppel in the criminal defendant's malpractice claim against the trial attorney certainly meets the doctrinal goal of preventing "multiple litigation, conserv[ing] judicial resources, and, by preventing inconsistent decisions, encourag[ing] reliance on adjudication."[69] Applying the collateral estoppel doctrine in this case would serve the very same goals.

There are two obvious distinctions between this suit and the malpractice cases. The first distinction is that this suit involves two civil actions, not a criminal case preceding a civil action. However, in searching the case law, we found no reason to believe that a case must have what is called a "cross-over"[70] element

---

[68] *Lichon, supra* at 428, n 16 (citations omitted).

[69] *Dearborn Heights, supra* at 124.

[70] See *Barrow, supra* at 481.

for collateral estoppel to apply. For instance, in *Alterman v Provizer, Eisenberg, Lichtenstein & Pearlman, PC*,[71] this Court considered whether the trial court erroneously granted summary disposition to the defendant law firm in the malpractice action, which concerned the firm's representation of the plaintiff in a federal civil suit against his employer for a work-related injury. The plaintiff and his employer settled, but after the settlement the plaintiff obtained new counsel and moved to set aside the settlement, claiming that he was not competent at the time he entered into it.[72] The plaintiff refused to let his former attorney and the attorney's staff waive the attorney-client privilege at the evidentiary hearing regarding the motion to set aside the settlement.[73] When the federal court denied the motion to set aside the settlement, the plaintiff did not appeal.[74] Rather, the plaintiff filed a lawsuit against his former attorney and the attorney's firm alleging that they had committed malpractice when they allowed him "to settle his federal case while mentally incompetent."[75]

On appeal in *Alterman*, the plaintiff in the malpractice action evidently argued that the trial court had erred in granting summary disposition on the basis of collateral estoppel because the defendant lawyer and firm had not been parties to the underlying action, and therefore mutuality of estoppel did not exist.[76] Though this Court was unwilling to hold that mutual-

---

[71] *Alterman v Provizer, Eisenberg, Lichtenstein & Pearlman, PC*, 195 Mich App 422, 423; 491 NW2d 868 (1992).

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.* at 423-424.

[76] *Id.* at 424-425.

ity had become irrelevant, as the defendants urged, it nevertheless examined and applied the collateral estoppel doctrine as explained in *Knoblauch* and *Schlumm*.[77] Observing that the competency issue had been litigated fully in the federal court and was the very issue disputed in the malpractice claim, the *Alterman* Court held that the "plaintiff is collaterally estopped from relitigating the issue, even though the parties are not identical, no mutuality exists, and no traditional exceptions apply."[78] Clearly, the fact that the collateral estoppel doctrine was being invoked in a case that lacked a cross-over element had no bearing on the Court's approach in *Alterman*. In comparison to this case, *Alterman* also presents a less compelling set of facts favoring collateral estoppel. In *Alterman*, the hearing to set aside the settlement did not provide the client and the former attorney the same motivation for litigating the competency issue fully because they were not adverse in the same way that K&R and the Bithells had adverse interests in the withdrawal proceeding. As a result, on the basis of the stronger facts in this case, we see no problem in applying *Barrow*, *Knoblauch*, and *Schlumm* simply because this case lacks a criminal component.

The second significant distinction between this case and the malpractice cases is that K&R is using collateral estoppel offensively. The malpractice cases that provide such a useful analogy for this case applied collateral estoppel defensively. As a result, those cases applied mutuality of estoppel, a component of the collateral estoppel doctrine,[79] much more

---

[77] *Alterman, supra* at 425-427.

[78] *Id.* at 427.

[79] See *Lichon, supra* at 427-428.

loosely, if at all.[80] As this Court briefly mentioned in *Knoblauch,* mutuality is a critical prerequisite when using collateral estoppel offensively.[81]

The Michigan Supreme Court's decision in *Howell v Vito's Trucking & Excavating Co*[82] is, perhaps, the best known Michigan case that discusses mutuality. In *Howell,* a Vito's Trucking vehicle struck and killed Hattie Howell and injured her daughter Anna Sue Collins, who was also riding in the Howell vehicle.[83] William Howell, evidently Hattie Howell's husband, filed a wrongful death suit in Michigan against Vito's Trucking on behalf of Hattie Howell's estate, himself, and as guardian for their son, James Howell.[84] Before the case went to trial, Collins obtained a judgment in federal court for the injuries she sustained in the accident.[85] This prompted William Howell to move for partial summary disposition, arguing that Vito's Trucking should not be allowed to relitigate its negligence.[86] The trial court denied the motion as it concerned William Howell, but granted it to the extent that Collins might be involved or have interests in the Michigan suit as Hattie Howell's heir.[87] This Court reversed the trial court's decision and remanded the case with instructions for the trial court to reconsider whether William Howell, in all his capacities, should have been

---

[80] See *Alterman, supra* at 427.

[81] See *Knoblauch, supra* at 720.

[82] *Howell v Vito's Trucking & Excavating Co,* 386 Mich 37; 191 NW2d 313 (1971).

[83] *Id.* at 40.

[84] *Id.*

[85] *Id.*

[86] *Id.* at 40-41.

[87] *Id.* at 41.

granted partial summary disposition.[88] This Court also indicated that "[t]he trial court had discretion to apply collateral estoppel against defendant, mutuality not being a controlling factor."[89]

When the *Howell* case reached the Supreme Court, the Court thoroughly reviewed the collateral estoppel doctrine and the mutuality requirement, though often mentioning res judicata.[90] The Court observed that, despite the familial relations and factual connections between the federal suit and the action in Michigan's courts, William Howell in each of his three roles in the suit (representative, individual, and guardian) and Collins were distinct legal entities.[91] The Court concluded that William Howell was not "bound" in the instant case by the federal court decision, which precluded applying the federal court result concerning the alleged negligence against Vito's Trucking.[92] In other words, William Howell could not use the determination in the federal proceeding to bar Vito's Trucking from challenging its negligence in the state court action. Thus, *Howell* essentially prohibited nonmutual offensive collateral estoppel.[93]

In reaching this result, the *Howell* Court acknowledged a compelling interest in balancing two competing concerns: "that the litigant against whom the doctrine is asserted has had his day in court; *vis-a-vis* that repetitious and needless litigation which burden our already overloaded court dockets must be

---

[88] *Id.*

[89] *Id.*

[90] *Id.* at 41-51.

[91] *Id.* at 44.

[92] *Id.* at 46.

[93] See *Knoblauch, supra* at 720.

avoided."[94] The Court, however, concluded that the need to give litigants their day in court did not require it to "sacrifice a well-established and valuable rule to achieve this balance."[95] The risk of eliminating mutuality was no less than the risk that some litigants might be denied their significant rights, such as the right to due process of law.[96]

In deciding whether *Howell* prevents collateral estoppel from applying in this case, we consider four factors. First, the Supreme Court was not concerned as much about William Howell's attempt to use collateral estoppel offensively,[97] but by his attempt to rely on the doctrine when not bound by the federal decision. That problem does not arise in this case. Judge Schnelz' order equally bound K&R and the Bithells, regardless of the names of the parties in the pleadings in the underlying action. Had the trial court reached the opposite decision, K&R would have been obligated to continue to represent the Bithells in the underlying action. This is the essence of mutuality.[98]

Second, the Supreme Court in *Howell* did not focus exclusively on the pleadings when determining whether the parties bound by the federal court decision were participating in the Michigan action. Rather, the Court also looked to the legal identities of the parties. Though the Club, Bloomfield Township, and Korzon were parties to the underlying action, the

[94] *Howell, supra* at 48.

[95] *Id.*; see *id.* at 51.

[96] *Id.* at 49-50.

[97] Subsequent case law suggests that collateral estoppel is not necessarily inappropriate when used offensively in the noncriminal context. See, e.g., *Nummer v Dep't of Treasury*, 448 Mich App 534, 548, n 14; 533 NW2d 250 (1995).

[98] See *Howell, supra* at 45-46.

withdrawal order did not bind them in any respect because they had no interest in whether K&R was able to withdraw and did not participate in the related proceedings at all. Their identity as parties in the underlying action do not, practically or legally, complicate the identity of the participants in the withdrawal proceeding in this case in the same way Collins' multiple interests as an injured plaintiff and a potential heir of a decedent complicated *Howell*. In this case, the participants in the motion for withdrawal proceeding, K&R and the Bithells, are not only bound by the order, but are identical to the parties in this case. As a result, to the extent that the identity of the parties shapes whether mutuality of estoppel exists,[99] K&R's identity and the Bithells' identity are sufficiently clear to conclude that this mutuality exists.

Third, the facts of this case do not conjure up fears about denial of due process or other important rights identified in *Howell*. As indicated above, the Bithells had their day in Judge Schnelz's court to dispute whether withdrawal was proper. This was the adversarial system *Howell* held in such high esteem.[100] Judge Schnelz simply disagreed with the Bithells' viewpoint. This surely demonstrates that the equities of this case are aligned in favor of collateral estoppel; collateral estoppel, which would have provided all the usual efficiencies had the trial court applied it, would not have sacrificed the Bithells' interest in a full and fair adjudication because they had already taken

---

[99] See *Knoblauch, supra* at 720.

[100] *Howell, supra* at 51.

advantage of that opportunity in the underlying action.[101]

Fourth and finally, failing to apply collateral estoppel in this case has consequences that the Supreme Court did not consider in *Howell*. Applying collateral estoppel in this case will play an important role in encouraging only proper withdrawal by counsel in future cases. If clients could challenge a withdrawal after an attorney or law firm established the grounds to withdraw identified in MRPC 1.16 and acquired permission to withdraw in the form of a court order, then attorneys and law firms would have no incentive to go through this formal procedure. Stated another way, if collateral estoppel did not apply in this situation, withdrawing under court order would expose an attorney or law firm to exactly the same consequences as abandoning a client. This exposure, in turn, would discourage law firms and attorneys from taking the time and incurring the expense of obtaining permission from the court to withdraw, which is what MRPC 1.16, operating in conjunction with MCR 2.117(C), contemplates. Alternatively, failing to apply collateral estoppel in this case may force some attorneys and law firms to remain counsel in cases in which the attorney-client relationship has degraded to the point where it is no longer beneficial to the client. Moreover, applying collateral estoppel in this way would have little effect on a subsequent malpractice action. After an attorney or law firm withdraws, the client could still challenge the attorney or firm's conduct in the time preceding the withdrawal, which would not have been necessarily litigated in

---

[101] *Id.* at 48, 51.

the decision concerning a motion to withdraw. Thus, the value of applying the collateral estoppel doctrine in this case is not only significant, it has few negative effects.[102]

The trial court, therefore, erred when it refused to instruct the jury to accept as fact that K&R had withdrawn properly in the underlying action. The trial court should have instructed the jury that, if it found that K&R and the Bithells had a contingent fee agreement it had to accept as fact that K&R did nothing wrong by withdrawing. As a result, the trial court should have also informed the jury that it should only consider the reasonable value of the services K&R rendered. Unlike in other cases,[103] the failure to issue this instruction was prejudicial, not harmless. The jury's communication with the trial court concerning what constituted proper withdrawal suggests that it was contemplating this aspect of the Bithells' defense. This communication, when coupled with the trial court's many instructions concerning the withdrawal, leave little doubt that, absent the opportunity to decide anew the question whether K&R withdrew properly, the jury would have returned a verdict in favor of K&R, even if the attendant award was vastly lower than the $414,726.85 the firm claimed the Bithells owed it. A new trial in which the trial court instructs the jury that it must accept it as fact that

---

[102] We wish to make clear that we are not holding that every decision permitting an attorney or law firm to withdraw is subject to the collateral estoppel doctrine. Rather, when the record supports the conclusion that the clients and their attorney or law firm have fully litigated withdrawal using the appropriate procedures available under the court rules and rules of professional conduct, then the usual collateral estoppel analysis applies, which may preclude relitigating the issue.

[103] See *Hilgendorf, supra* at 695-696.

K&R withdrew properly from the underlying action is the only viable remedy for this error.

### D. CONTRACT

The trial court instructed the jury that K&R had the burden of proof

> with respect to any claim [f]or breach of contract on the hourly rate, plus agreement between the parties on each of the following four propositions: 1) The plaintiff [K&R] has to prove the existence of a valid contract; 2) Plaintiff has to prove the terms of the contract; 3) Plaintiff has to prove the performance of things to be performed by the plaintiff; and 4) The plaintiff has to prove non-performance by the defendant [the Bithells].

Soon thereafter, the trial court informed the jury that the Bithells

> have the burden of proof with respect to their claim that the fee agreement between themselves and Keywell and Rosenfeld was changed through [the] Contingent Fee Agreement. In order to find the agreement was changed to a Contingent Fee Agreement you must find three things: 1) The existence of a valid agreement to change the fee agreement; 2) The terms of the Contingent Fee Agreement; and 3) That Mr. Cleary had actual or apparent authority to change the fee agreement interest [to] a Contingent Fee Agreement on behalf of Keywell and Rosenfeld.

K&R does not contend that the Bithells had any burden of proof concerning the breach of contract claim. Rather, it argues that the trial court erred in inserting the words "plaintiff has to prove" in the instructions because those words do not appear in the model instruction. It claims that this additional language had the effect of erroneously placing a *higher* burden of

proof on K&R than it was supposed to have. The language in both sets of instructions correctly allocated each party's burden of proof though the instructions were not identical as concerned the burden. Though not perfect, the instructions adequately informed the jury of which party had to prove what elements of which claims.[104] This was not error requiring reversal, although on remand the trial court would be well-advised to adopt a more even-handed approach in describing the parties' respective burdens of proof.

### E. QUANTUM MERUIT

When explaining the term quantum meruit to the jury, the trial court defined the term as meaning "an amount of recovery as much as deserved," explaining that quantum meruit is "an equitable principle that measures recovery under an implied contract to pay compensation as reasonable value of services rendered." The trial court informed the jury that "among the factors to consider is what percentage of total work has been completed by the attorney or attorneys seeking fees to obtain results of the parties." K&R argues that this instruction was improper because there was no evidence of the percentage of work completed on the underlying action. K&R adds that this theory was inapplicable because, at the time of trial in this case, the underlying action had yet to be completed.

---

[104] See *Case, supra* at 6 ("Even if somewhat imperfect, instructions do not create error requiring reversal if, on balance, the theories of the parties and the applicable law are adequately and fairly presented to the jury.").

This Court affirmed a trial court's decision to calculate quantum meruit as a percentage of work completed in *Morris v Detroit*[105] and approved that approach in *Reynolds v Polen*.[106] Thus, the trial court's quantum meruit instruction was not, per se, incorrect. However, this instruction was of little value to the jury in light of the evidence that the underlying action had yet to be resolved. Unlike in *Morris*[107] and *Reynolds*,[108] the underlying action in this case had not yet been tried or settled, making it impossible to calculate quantum meruit as a percentage of the recovery obtained as a result of a trial or settlement.

Nevertheless, as the *Reynolds* Court indicated, "[Q]uantum meruit is generally determined by simply multiplying the number of hours worked by a reasonable hourly fee."[109] The trial court properly defined quantum meruit, which does mean "as much as deserved."[110] The trial court also instructed the jury on the factors relevant to reasonable attorney fees. Thus, the trial court gave the jury an alternate and appropriate method for calculating quantum meruit. Nevertheless, on retrial, the trial court should consider whether this method of calculating damages is appropriate in light of the status of the underlying action.

---

[105] *Morris v Detroit*, 189 Mich App 271, 280; 472 NW2d 43 (1991).

[106] *Reynolds v Polen*, 222 Mich App 20, 29-31; 564 NW2d 467 (1997).

[107] *Morris, supra* at 279-280.

[108] *Reynolds, supra* at 23.

[109] *Id.* at 28.

[110] Black's Law Dictionary (6th ed, 1990), p 1243.

F. REASONABLE VALUE OF LEGAL SERVICES

The trial court instructed the jury consistently with SJI2d 180.03,[111] which essentially identifies the factors in MRPC 1.5 that are relevant to determining whether attorney fees are reasonable, not excessive. The trial court added:

> A lawyer is bound by the Michigan Rules of Professional Conduct. The rule [MRPC 1.5] states that a lawyer shall not enter into an agreement for[,] charge[,] or collect an illegal or clearly excessive fee. A fee is clearly excessive when, after review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is excessive of a reasonable fee. A lawyer of ordinary prudence is just a lawyer who—he's not crazy or anything—but just a lawyer acting reasonably.

K&R argues that the trial court erred in including this additional language about MRPC 1.5 because it raised the firm's burden of demonstrating that its fees were reasonable. Though somewhat repetitive, the instructions were accurate and not confusing.[112]

K&R also contends that the trial court improperly left the jury to come to its own understanding of a "lawyer of ordinary prudence." This was not the trial court's smoothest instruction to the jury, but the trial court redeemed itself by defining a "lawyer of ordinary prudence" as "a lawyer acting reasonably." "Prudence" means "[c]arefulness, precaution, attentiveness, and good judgment, as applied to action or conduct. That degree of care required by

---

[111] Now M Civ JI 180.03.

[112] See *Morris, supra* at 278-279, quoting *Crawley v Schick*, 48 Mich App 728, 737; 211 NW2d 217 (1973) (enumerating nonexhasutive list of factors relevant to reasonable attorney fees).

the exigencies or circumstances under which it is to be exercised." Reasonable action is a fair explanation of the concept of prudence.[113] K&R provides no authority, not even a dictionary definition, to suggest that this instruction was erroneous.

Reversed and remanded for further proceedings consistent with this opinion. K&R may present all the claims and theories it originally pressed at the trial in this case in a new trial. We do not retain jurisdiction.

---

[113] See Black's Law Dictionary, *supra* at 1226.