*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

BRIAN PALMER and AMERIVEST, LLP,

        Plaintiffs-Appellants,

v

ATTORNEY GENERAL and SCOTT TETER,

        Defendants-Appellees.

UNPUBLISHED
May 30, 2019

No. 340119
Macomb Circuit Court
LC No. 2016-004357-NO

Before: SAWYER, P.J., and CAVANAGH and SERVITTO, JJ.

PER CURIAM.

Plaintiffs, Brian Palmer and Amerivest, LLP, appeal as of right the trial court's order granting defendants, the former Michigan Attorney General (AG) and Scott Teter (Teter), summary disposition and denying plaintiffs' request for injunctive relief. We affirm.

This case arises from the issuance and online posting of a press release by defendants regarding Palmer, a former State Representative for Macomb County. Palmer has been a partner of Amerivest since 2001, and acts as its president and manager. Bill Schuette is the former Michigan Attorney General, and Teter is an assistant attorney general. In December of 2013, a misdemeanor complaint was filed against Palmer in district court, alleging one count of willful neglect of duty pursuant to MCL 750.478.[1] The complaint included the following factual information:

---

[1] MCL 750.478 provides:

> When any duty is or shall be enjoined by law upon any public officer, or upon any person holding any public trust or employment, every willful neglect to perform such duty, where no special provision shall have been made for the punishment of such delinquency, constitutes a misdemeanor punishable by imprisonment for not more than [one] year or a fine of not more than $1,000[ ].

This case is related to [*People v API Worldwide Holdings*]. The scheme is based on the misrepresentation that Dan Hershey has millions of dollars "locked up" in overseas accounts with Lloyds Bank. The schemers then solicited money from "investors" that is supposedly to be pooled with other investors' funds and used to pay off various tax liens, fees, and other charges that are keeping Hershey's Lloyd's Bank account "locked up." Although the promises varied, the schemers usually gave the victims promissory notes that reflect 10% interest and promise a "fee" of many times the initial investment amount. The schemers usually asked for the money on short notice, and assured the "investor" that repayment was 30-90 days away. To date, API has taken in $9,245,814 from over 150 victims from this same scheme from 2006 to present.

Brian Palmer was a state representative from Romeo in Macomb County at the time of his involvement with API. Palmer told [Jeffrey L. Ripley] that Palmer could assist Ripley in moving money from overseas to domestic accounts. In 2006, Palmer wired $11,000 to Dan Hershey for scheme-related expenses. Ripley told Palmer that he wanted to sell API investments in a way to circumvent Michigan's [securities] laws. As a result, Palmer provided Ripley with sample documents for Ripley's use in the scheme[,] including promissory notes and facilitation agreements designed to circumvent the Michigan[ ] Securities Act. In addition, Palmer carried a cell phone provided by API and answered calls from potential investors even while on the House floor. Palmer was aware that Ripley had advised several potential API "investors" that "State Representative" Palmer was also an investor who was helping API unlock the Lloyds' account. Interviews of investors confirmed that Ripley used Palmer's name and position as a public official to vouch for and sell the API scheme. Investors stated that Palmer's name provided legitimacy to the API investment. Palmer also acted as a guarantor for API "investor" Bob Carlton in 2007. The API investment paperwork was structured as a loan from the investor to API. Palmer was guaranteeing that if API didn't repay Carlton with interest, that Palmer would repay Carlton. During the same time period according to records at the Office of Finance, Insurance[,] and Regulation (OFIR), Palmer reported another securities scheme to OFIR[,] but never reported API. Finally, Ripley owed Palmer $400,000 from a previous loss that Ripley repaid Palmer with API securities. Therefore, Palmer believed if he cooperated with the API scheme and it was successful, he would get that money back.

The same day that the misdemeanor complaint was filed, a plea hearing and sentencing were held. Teter appeared on behalf of the prosecution. Palmer wanted to plead no contest. Teter asserted that no additional charges would be filed against Palmer regarding his involvement in "any of the API Worldwide investment scheme." The misdemeanor complaint was used as a factual basis for the plea. The court asked counsel if it was acceptable if the court took judicial notice and deemed read into the record the introductory paragraphs of the misdemeanor complaint for the factual basis, and both Teter and Palmer's counsel answered, "No objection, Your Honor." The court found that a factual basis for the plea was demonstrated by the misdemeanor complaint, found Palmer's plea understanding, voluntary, and accurate, and accepted the plea. Before sentencing, Palmer's counsel stated that he was "not going to take

-2-

issue at this point with Mr. Teter's factual recitation, or what the factual recitation is in the [misdemeanor] complaint." Palmer was sentenced to 12 months' probation and 320 hours of community service.

Later that day, defendants issued a press release regarding Palmer, which was posted to the Michigan Attorney General website. The headline of the press release read: "Schuette Announces Conviction of Former Macomb State Representative for Role in Ponzi Scheme." The press release indicated that Palmer pleaded no contest to the misdemeanor of neglect of duty by a public official, and that "[t]he conviction stems from Palmer using his position as an elected official to assist the ring-leader of a $9 million Ponzi scheme." The posting noted that the scheme was conducted by API, and that Palmer cooperated with the Attorney General's investigation after losing $400,000 of his own money. The scheme operators, Ripley and Danny Lee VanLiere, targeted elderly victims, and convinced them to cash in proceeds from certificates of deposit without returning any of the investments. The press release contained the following under the subheading, "Palmer's Role":

> Palmer served as a state representative from 2002 – 2008. During that time, Palmer used his position as an elected official to assist Ripley and VanLiere in their Ponzi scheme involving API Worldwide, Inc. Prior to his involvement with API, Palmer had invested $400,000 with Ripley on an unregistered security. Ripley lost Palmer's $400,000 on the investment and assured Palmer that he would get his money back if Palmer helped him with API. Ripley gave Palmer credit for the $400,000 in API investments and Palmer cooperated with API because he believed he would receive a return on his lost funds.

> Palmer met with potential investors on behalf of Ripley and API. With the knowledge that Ripley was attempting to circumvent the Securities Act, Palmer did not report the conduct to proper authorities.

> Palmer carried a cell phone provided by API and answered calls from potential investors even while on the House floor. To circumvent state security laws, Palmer assisted Ripley by providing documents to make the scheme appear legitimate and signed investment guarantees. And, with Palmer's knowledge, Ripley used Palmer's name and position as a public official to vouch for and sell the API scheme to potential victims.

The press release specified that Palmer was charged with the misdemeanor of neglect of duty of a public official, for which he pleaded no contest, and was sentenced to probation and community service to be spent helping the elderly and the homeless. Ripley and VanLiere pleaded no contest to racketeering and selling unregistered securities in March of 2013, and Douglas Kacos and Thomas Doctor pleaded no contest to money laundering in December of 2013, for assisting Ripley and VanLiere.

Palmer's counsel requested that Attorney General Schuette remove the press release from the website, and defendants denied this request after conducting an investigation. Plaintiffs thus filed suit against defendants, alleging defamation and tortious interference with business

relations. Defendants filed a motion for summary disposition in response, which the court granted, and this appeal followed.

On appeal, plaintiffs argue that the trial court erred in granting defendants summary disposition because, contrary to what the court found, collateral estoppel did not apply, genuine issues of material fact existed regarding plaintiffs' claims of defamation and tortious interference with business relationships, and plaintiffs were entitled to injunctive relief. We agree that the trial court erred in applying the doctrine of collateral estoppel, but nonetheless conclude that the trial court properly granted defendants summary disposition, and properly denied plaintiffs injunctive relief.

## I. COLLATERAL ESTOPPEL

Plaintiffs argue on appeal that the trial court erred in determining that collateral estoppel applied because plaintiffs lacked a full and fair opportunity to defend against any allegations that they were involved in a Ponzi scheme. We agree.

This Court reviews a motion for summary disposition de novo. *Gorman v American Honda Motor Co, Inc*, 302 Mich App 113, 115; 839 NW2d 223 (2013). The applicability of the doctrine of collateral estoppel is also a question of law subject to de novo review on appeal. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008). Defendants moved for summary disposition pursuant to MCR 2.116(C)(7), (8), and (10). The court did not specify under which subsection it determined that collateral estoppel applied to plaintiffs' claims.

Summary disposition is proper under MCR 2.116(C)(7) if the plaintiff's claims are barred on the basis of collateral estoppel. *Alcona Co v Wolverine Environmental Prod, Inc*, 233 Mich App 238, 246; 590 NW2d 586 (1998). This Court must accept all well-pleaded factual allegations as true, and construe them in favor of the plaintiff, unless other evidence contradicts them, when reviewing a motion under MCR 2.116(C)(7). *Dextrom v Wexford Co*, 287 Mich App 406, 428; 789 NW2d 211 (2010). "If any affidavits, depositions, admissions, or other documentary evidence are submitted, the court must consider them to determine whether there is a genuine issue of material fact. If no facts are in dispute, and if reasonable minds could not differ regarding the legal effect of those facts, the question whether the claim is barred is an issue of law for the court." *Id*. at 429 (citations omitted). If a question of fact does exist to the extent that recovery could be provided by factual development, dismissal is inappropriate. *Id*.

When a party moves for summary disposition under multiple subrules, the trial court rules on the motion without specifying the subrule under which it made its decision, and the trial court considered documentary evidence beyond the pleadings, this Court typically reviews the decision as if it were based on MCR 2.116(C)(10). *Cuddington v United Health Servs, Inc*, 298 Mich App 264, 270; 826 NW2d 519 (2012). Although defendants also moved for summary disposition pursuant to MCR 2.116(C)(8), they supported their motion with documentary evidence. Therefore, the proper standard of review is under MCR 2.116(C)(10). A motion for summary disposition under MCR 2.116(C)(10) challenges the factual sufficiency of a plaintiff's claim. *Gorman*, 302 Mich App at 115. The trial court considers the evidence in the light most favorable to the nonmoving party. *Id*. Summary disposition is proper under MCR 2.116(C)(10) if " 'there is no genuine issue regarding any material fact and the moving party is entitled to

judgment as a matter of law.' " *Id*. at 116 (citation omitted). There is a genuine issue of material fact " 'when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ.' " *Id*. (citation omitted).

The trial court granted defendants summary disposition, in part, on the basis of collateral estoppel. The doctrine of collateral estoppel refers to issue preclusion. *Ditmore v Michalik*, 244 Mich App 569, 577; 625 NW2d 462 (2001). Collateral estoppel "precludes relitigation of an issue in a subsequent, different cause of action between the same parties or their privies when the prior proceeding culminated in a valid final judgment and the issue was actually and necessarily determined in the prior proceeding." *Id*. The doctrine is intended to " 'relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication . . . .' " *Monat v State Farm Ins Co*, 469 Mich 679, 692-693; 677 NW2d 843 (2004) (citation omitted). Collateral estoppel applies in both civil and criminal cases, and crossover estoppel between civil and criminal proceedings can occur. See *Barrow v Pritchard*, 235 Mich App 478, 481; 597 NW2d 853 (1999) ("Crossover estoppel, which involves the preclusion of an issue in a civil proceeding after a criminal proceeding and vice versa, is permissible.").

For collateral estoppel to apply, the following requirements must be met: "(1) a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment; (2) the same parties must have had a full and fair opportunity to litigate the issue; and (3) there must be mutuality of estoppel." *Monat*, 469 Mich at 682-683 (quotation marks and citations omitted). Under the first element, the ultimate issue must be identical to the issue involved in the first action, not merely similar. *Keywell & Rosenfeld v Bithell*, 254 Mich App 300, 340; 657 NW2d 759 (2002). The parties must have had a " 'full and fair' opportunity" to litigate the issues in the first action. *Id*. However, a matter resolved by a no contest, or nolo contendere plea, has not been "actually litigated" for the purposes of collateral estoppel:

> The taking of [the plaintiff's] nolo contendere plea cannot be considered "actual litigation," at least not in terms of collateral estoppel jurisprudence. The essence of a nolo contendere plea is in its name, "nolo contendere," or "I will not contest it." If the charges are uncontested, they are necessarily unlitigated. Neither can we accurately say that the procedures followed by the judge in establishing a factual basis for taking a nolo contendere plea constitute "actual litigation." [*Lichon v American Universal Ins Co*, 435 Mich 408, 429; 459 NW2d 288 (1990).]

As a result of the *Lichon* decision, MRE 410 was amended to clarify the original intent of the rule – that evidence of a nolo contendere plea, "in any civil or criminal proceeding," is inadmissible "except that, to the extent that evidence of a guilty plea would be admissible, evidence of a plea of nolo contendere to a criminal charge may be admitted in a civil proceeding to support a defense against a claim asserted by the person who entered the plea." MRE 410(2). See *Lichon*, 435 Mich at 423 ("a plea of nolo contendere may not be introduced against the party who entered that plea, irrespective of whether that party is a plaintiff or a defendant in subsequent litigation."). The fourth element of mutuality is not required when collateral estoppel is used defensively against a party who has already had a full and fair opportunity to litigate the issue. *Monat*, 469 Mich at 680-681, 691, 695.

-5-

The trial court misapplied the doctrine of collateral estoppel to plaintiffs' claims. The trial court determined that defendants could defensively assert collateral estoppel because Palmer had a full and fair opportunity to litigate whether the introductory paragraphs of the misdemeanor complaint and the statements made by his counsel were true at the plea and sentencing hearing, and Palmer failed to object. It is true that at the hearing, Palmer's counsel had "no objection" to the court taking judicial notice and reading into the record the introductory paragraphs of the misdemeanor complaint to serve as the factual basis for the no contest plea. Palmer's counsel also stated that he was not going to "take issue" with the factual recitation made by Teter or in the misdemeanor complaint. Thus, the trial court concluded that the facts were "actually litigated" because the court accepted the plea, relied on the statements in the misdemeanor complaint as a factual basis, and Palmer was "estopped from contesting the veracity of the statements contained in the criminal complaint and made at his plea and sentencing hearing."

The trial court erred when it determined that plaintiffs had a "full and fair opportunity to litigate" whether the introductory paragraphs of the misdemeanor complaint and the statements made at the hearing were actually true. This is because the taking of a no contest plea is not "actual litigation" for purposes of collateral estoppel, nor is the procedure followed by the lower court in establishing the factual basis considered "actual litigation." *Lichon*, 435 Mich at 429. Although Palmer and his attorney had no objections to the misdemeanor complaint or the factual recitation, this was part of the procedure to establish the factual basis, and does not constitute "actual litigation." *Id*. Therefore, the trial court erred when it determined that defendants could defensively assert collateral estoppel against plaintiffs. Although collateral estoppel may be used defensively, it cannot be here where the plea entered was no contest. MRE 410(2).

Moreover, the doctrine of collateral estoppel does not apply in these circumstances because the issue to be decided in the subsequent litigation must be identical to the issue involved in the first action, rather than merely similar. *Keywell*, 254 Mich App at 340. In the initial action, Palmer entered a no contest plea to the charge of neglect of duty. In the subsequent civil action, plaintiffs alleged claims of defamation and tortious interference with business relationships based on the content of the press release. Although defendants assert that the press release language is based on the statements made in the misdemeanor complaint and at the hearing, and they are substantially similar, it cannot be said that the issue in the civil action is identical to the issue in the first action. *Id*. Plaintiffs do not challenge the factual basis included in the misdemeanor complaint and on the record as the basis for which Palmer entered his no contest plea. Rather, plaintiffs challenge the language used in the press release, issued after the plea hearing and entry of the plea, as defamatory and constituting a tortious interference with business relations. Therefore, the doctrine of collateral estoppel does not apply and the trial court erred in granting defendants summary disposition based on the doctrine.

## II. DEFAMATION

Plaintiffs argue that the trial court erred in granting defendants summary disposition regarding their defamation claim because they were not collaterally estopped from bringing this claim and that questions of fact existed regarding whether the statements in the press release were true. As discussed above, the trial court erred in applying the doctrine of collateral estoppel to plaintiffs' claims. We disagree, however, with plaintiffs' assertion that the trial court erred in

granting defendants summary disposition regarding their defamation claim pursuant to MCR 2.116(C)(10).

The trial court specifically granted defendants summary disposition of plaintiffs' defamation claim pursuant to MCR 2.116(C)(10). Therefore, the standard of review pursuant to MCR 2.116(C)(10) provided above applies to this issue as well.

"A plaintiff claiming defamation must plead a defamation claim with specificity by identifying the exact language that the plaintiff alleges to be defamatory." *Ghanam v Does*, 303 Mich App 522, 543; 845 NW2d 128 (2014). In the complaint, plaintiffs alleged that the following nine statements in the press release were false and defamatory:

> [1.] Palmer [pleaded] no contest in a "Ponzi scheme."

> [2.] Palmer "assisted two other men to operate a $9 million Ponzi scheme that defrauded more than 150 persons between 2006 and 2012."

> [3.] Palmer "used his position as an elected official to assist operators" in operating a fraudulent investment company.

> [4.] Palmer had invested "$400,000 with Ripley [an alleged operator of the Ponzi scheme] in an unregistered security."

> [5.] The "conviction [of Palmer] stems from Palmer using his position as an elected official to assist the ring-leader of a $9 million Ponzi scheme."

> [6.] "Palmer met with potential investors on behalf of Ripley and API, with the knowledge that Ripley was attempting to circumvent the Securities Act, and that Palmer did not report the conduct to proper authorities."

> [7.] "Palmer carried a cell phone provided by API and answered calls from potential investors even while on the House floor."

> [8.] "[T]o circumvent state security laws, Palmer assisted Ripley by providing documents to make the scheme appear legitimate and signed investment guarantees."

> [9.] With "Palmer's knowledge, Ripley used Palmer's name and position as a public official to vouch for and sell the API scheme to potential victims."

A communication is considered defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Smith v Anonymous Joint Enterprise*, 487 Mich 102, 113; 793 NW2d 533 (2010) (quotation marks and citation omitted). A claim for defamation requires proof of the following elements:

> "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the

part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication." [*Sakar v Doe*, 318 Mich App 156, 178; 897 NW2d 207 (2016), quoting *Smith*, 487 Mich at 113 (citation omitted).]

Words that charge the commission of a crime are considered defamatory per se, "and hence, injury to the reputation of the person defamed is presumed to the extent that the failure to prove damages is not a ground for dismissal." *Lawrence v Burdi*, 314 Mich App 203, 214; 886 NW2d 748 (2016) (citation omitted).

"Truth is an absolute defense to a defamation claim." *Wilson v Sparrow Health Sys*, 290 Mich App 149, 155; 799 NW2d 224 (2010). However, to avoid liability, it is unnecessary for defendants to prove that the publication is " 'literally and absolutely accurate in every minute detail.' " *Collins v Detroit Free Press, Inc*, 245 Mich App 27, 33; 627 NW2d 5 (2001) (citation omitted). "[S]ubstantial truth is an absolute defense to a defamation claim." *Id*.

Michigan courts have held that " '[s]light inaccuracies of expression are immaterial provided that the defamatory charge is true in substance.' " . . . " 'It is sufficient for the defendant to justify so much of the defamatory matter as constitutes the sting of the charge, and it is unnecessary to repeat and justify every word . . . so long as the substance of the libelous charge be justified,' " and " 'the inaccuracy in no way alters the complexion of the affair, and would have no different effect on the reader than that which the literal truth would produce . . . .' " . . . "Thus, the test look[s] to the sting of the article to determine its effect on the reader; if the literal truth [would have] produced the same effect, minor differences [a]re deemed immaterial." [*Id*. (citations omitted).]

The trial court granted defendants summary disposition regarding plaintiffs' defamation claim because the complaint and the transcript from plea and sentencing hearing established that the allegedly false and defamatory statements were substantially true, so there were no genuine issues of material fact. We agree.

Plaintiffs allege that the press release said that he pleaded "no contest in a 'Ponzi scheme.' " Although the term "Ponzi scheme" was not used in the misdemeanor complaint or at the hearing, the misdemeanor complaint provided that the case was related to the API case, and a "scheme" based on a "misrepresentation" that Hershey had money in overseas accounts, and investors were promised a return that was never repaid. Additionally, the press release does not state that Palmer "pleaded no contest in a 'Ponzi scheme,' " as alleged by plaintiffs. The headline of the press release was "Schuette Announces Conviction of Former Macomb State Representative *for Role in Ponzi Scheme*." The press release twice indicated that Palmer pleaded no contest to neglect of duty. At the plea hearing and sentencing, Teter asserted that no additional charges would be filed against Palmer for involvement in "any of the API Worldwide investment scheme." Therefore, the first statement challenged by plaintiffs was not false or defamatory because it was not contained in the press release.

Plaintiffs also alleged that the press release falsely said that Palmer " 'assisted two other men to operate a $9 million Ponzi scheme that defrauded more than 150 persons between 2006

and 2012.' " This is not a direct quote from the press release. The press release provided that Palmer's conviction "stems from Palmer using his position as an elected official to assist the ring-leader of a $9 million Ponzi scheme. The scheme, conducted by API Worldwide, Inc., defrauded more than 150 victims between 2006 and 2012." These statements are substantially true based on the misdemeanor complaint. *Collins*, 245 Mich App at 33. The misdemeanor complaint provided that Palmer told Ripley that he would help Ripley move money from overseas to domestic accounts, and Palmer wired money to Hershey "for scheme-related expenses." The misdemeanor complaint also provided that API took $9,245,814 from over 150 victims since 2006.

Next, plaintiffs alleged that the press release falsely said that Palmer " 'used his position as an elected official to assist operators' in operating a fraudulent investment company," and the " 'conviction [of Palmer] stems from Palmer using his position as an elected official to assist the ring-leader of a $9 million Ponzi scheme.' " These statements are substantially true. *Id*. The misdemeanor complaint identified Palmer as a former state representative for Macomb County. The misdemeanor complaint provided that Palmer told Ripley that he would help Ripley move money from overseas to domestic accounts, Palmer wired money to Hershey, he provided Ripley with documents to circumvent Michigan securities laws, he carried an API cellular telephone and took calls from investors, and he acted as a guarantor for one investor. Thus, the statement that " 'Palmer carried a cell phone provided by API and answered calls from potential investors even while on the House floor' " is substantially true. This sentence in the press release is almost verbatim to the sentence in the misdemeanor complaint.

Plaintiffs also assert that the statement that Palmer " 'had invested '$400,000 with Ripley [an alleged operator of the Ponzi scheme] in an unregistered security' " was false and defamatory. This statement is substantially true. *Id*. The misdemeanor complaint provided, "Ripley owed Palmer $400,000 from a previous loss that Ripley never repaid Palmer with API securities."

Plaintiffs also raised issue with the statements in the press release that " 'Palmer met with potential investors on behalf of Ripley and API, with the knowledge that Ripley was attempting to circumvent the Securities Act, and that Palmer did not report the conduct to proper authorities,' " and " 'to circumvent state security laws, Palmer assisted Ripley by providing documents to make the scheme appear legitimate and signed investment guarantees.' " The misdemeanor complaint provided:

> Ripley told Palmer that he wanted to sell API investments in a way to circumvent Michigan's [securities] laws. As a result, Palmer provided Ripley with sample documents for Ripley's use in the scheme[,] including promissory notes and facilitation agreements designed to circumvent the Michigan[ ] Securities Act. . . Palmer also acted as a guarantor for API "investor" Bob Carlton in 2007. The API investment paperwork was structured as a loan from the investor to API. Palmer was guaranteeing that if API didn't repay Carlton with interest, that Palmer would repay Carlton. During the same time period according to records at the Office of Finance, Insurance[,] and Regulation (OFIR), Palmer reported another securities scheme to OFIR[,] but never reported API.

Thus, these statements were substantially true. *Id*.

Lastly, plaintiffs alleged that the statement "With 'Palmer's knowledge, Ripley used Palmer's name and position as a public official to vouch for and sell the API scheme to potential victims' " was false and defamatory. However, the misdemeanor complaint provided that Palmer was aware that Ripley advised potential investors that " 'State Representative' " Palmer was also an investor, and interviews of investors confirmed that Ripley used Palmer's name to vouch for the scheme. "Investors stated that Palmer's name provided legitimacy to the API investment." Thus, this statement is substantially true. *Id*.

Plaintiffs assert that the affidavit of Palmer creates genuine issues of material fact regarding whether the statements in the press release were substantially true. In Palmer's affidavit, he merely states that he did not do what is asserted in the nine allegedly defamatory statements identified by plaintiffs in the complaint. This does not create genuine issues of material fact. The affidavit fails to set forth specific facts showing the existence of a genuine issue of material fact. *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). An affidavit of this nature, therefore, is insufficient to establish a genuine issue of material fact, even when viewed in a light most favorable to plaintiffs. *Id*.

Because there are no genuine issues of material fact that the statements in the press release were substantially true, the trial court properly granted defendants' summary disposition motion regarding plaintiffs' defamation claim pursuant to MCR 2.116(C)(10). Although the trial court improperly granted summary disposition on this claim based on collateral estoppel, as discussed above, "[t]his Court ordinarily affirms a trial court's decision if it reached the right result, even for the wrong reasons." *Wickings v Artic Enterprises, Inc*, 244 Mich App 125, 150; 624 NW2d 197 (2000). As such, we affirm the trial court's grant of summary disposition to defendants regarding plaintiffs' defamation claim.

### III. TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

Plaintiffs argue on appeal that the trial court erred when it granted defendants summary disposition of their tortious interference with business relationships claim because defendants knew of plaintiffs' business relationships before issuing the press release, and issued the press release to intentionally interfere with plaintiffs' businesses. We disagree.

The trial court granted defendants summary disposition of plaintiffs' tortious interference with business relationships claim pursuant to MCR 2.116(C)(8) and (C)(10). However, as mentioned above, when a party moves for summary disposition under multiple subrules, and the trial court considered documentary evidence beyond the pleadings, this Court typically reviews the decision as if it were based on MCR 2.116(C)(10). *Cuddington*, 298 Mich App at 270. Although defendants moved for summary disposition pursuant to MCR 2.116(C)(8) and (C)(10), they supported their motion with documentary evidence. Therefore, the proper standard of review is under MCR 2.116(C)(10).

A claim of intentional interference with a business relation requires proof of:

(1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the

-10-

relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted. [*Health Call of Detroit v Atrium Home & Health Care Servs, Inc*, 268 Mich App 83, 90; 706 NW2d 843 (2005).]

To succeed on this claim, the plaintiff must establish "the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Badiee v Brighton Area Schs*, 265 Mich App 343, 367; 695 NW2d 521 (2005) (quotation marks and citation omitted). To establish a "valid business expectancy," the plaintiff must demonstrate that the expectancy is "a reasonable likelihood or probability[,] not mere wishful thinking." *Cedroni Assoc, Inc v Tomblinson, Harburn Assoc, Architects & Planners Inc*, 492 Mich 40, 45; 821 NW2d 1 (2012) (quotation marks and citation omitted; alteration in original). The plaintiff must show affirmative acts by the defendant that evince a motive of improper interference. *Badiee*, 265 Mich App at 367. If the defendant's actions were motivated by legitimate business reasons, no improper motive exists. *Id*.

Palmer attested that he was the president and manager of Amerivest since 2001 and a general partner since 2012. As a part of his employment, he sought investment opportunities in technology and real estate, and found partners to invest in these opportunities. At the time that the press release was issued, Palmer averred that he "was working with several substantial investors seeking private capital for multiple projects and investment opportunities." Palmer claimed that defendants were on notice of such relationships before issuing the press release because Palmer told an investigator for the Attorney General, Martin May, that any criminal allegations "could not have come out at a worse time because [he] had several business deals and transactions pending." According to Palmer, as a result of the press release, current investors withdrew their commitments and demanded liquidation of their investments, and pending investors rescinded their commitments. One company, Doran Capital, LLC, cancelled a future investment with a value of $13,200,000, and Palmer identified several other investors that withdrew from their partnerships with Palmer. Thus, elements one, two, and four of plaintiffs' claim for tortious interference with a business relation are met. *Health Call of Detroit*, 268 Mich App at 89-90.

However, there is no genuine issue of material fact that plaintiffs failed to establish the third element of an "intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy." *Id*. There is no evidence of an "intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Badiee*, 265 Mich App at 367. A manufactured or false representation may provide evidence that a person intentionally interfered. *Wood v Herndon & Herndon Investigations, Inc*, 186 Mich App 495, 503; 465 NW2d 5 (1990). However, plaintiffs have been unable to establish any wrongdoing by defendants based on the alleged acts of defamation, as a required element to establish the tort of interference with a business relationship or expectancy. See *Lakeshore Community Hosp, Inc v Perry*, 212 Mich App 396, 402-403; 538 NW2d 24 (1995) (finding that the defendant did not defame or interfere with business relations by, among other actions, "questioning the operation

of the plaintiff hospital" and expressing opposition to a merger). As explained, the allegedly false or defamatory statements in the press release were substantially true based on the misdemeanor complaint and statements made at Palmer's plea and sentencing hearing. Thus, there was no intentional doing of a per se wrongful act because the statements were substantially true. There was no evidence of malice, or any actions taken with the purpose of interfering with plaintiffs' businesses. "To establish that a lawful act was done with malice and without justification, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference." *BPS Clinical Laboratories v Blue Cross and Blue Shield of Mich*, 217 Mich App 687, 699; 552 NW2d 919 (1996). There was no malice or specific affirmative act by defendants as they regularly posted press releases on the website of the Attorney General. Therefore, the trial court properly granted defendants summary disposition regarding plaintiffs' tortious interference with business relationships claim.

IV. INJUNCTIVE RELIEF

Plaintiffs argue on appeal that the trial court erred when it denied their motion for a preliminary injunction because they established the criteria for such relief. We disagree.

This Court will not reverse the grant or denial of a preliminary injunction by the trial court absent an abuse of discretion. *Davis v City of Detroit Fin Review Team*, 296 Mich App 568, 612; 821 NW2d 896 (2012). An abuse of discretion occurs "when the decision is outside the range of principled outcomes." *Id*. The facts that the trial court relied on in exercising this discretion are reviewed for clear error. *Id*. at 613. A finding is clearly erroneous when this Court is left with a definite and firm conviction that a mistake has been made. *VanZandt v State Employees' Retirement Sys*, 266 Mich App 579, 585; 701 NW2d 214 (2005).

The procedure for issuing a preliminary injunction is provided in MCR 3.310. Unless otherwise provided by statute or court rule, a preliminary injunction may not be granted without a hearing. MCR 3.310(A)(1). The party seeking injunctive relief bears the burden of proving that a preliminary injunction should be granted. MCR 3.310(A)(4). A preliminary injunction " 'represents an extraordinary and drastic use of judicial power that should be employed sparingly and only with full conviction of its urgent necessity.' " *Davis*, 296 Mich App at 612. It should only be granted when justice so requires, there is no adequate remedy at law, and a real and imminent danger of irreparable injury exists. *Id*. at 613-614. The following factors are considered to determine whether to grant a preliminary injunction:

(1) the likelihood that the party seeking the injunction will prevail on the merits, (2) the danger that the party seeking the injunction will suffer irreparable harm if the injunction is not issued, (3) the risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief, and (4) the harm to the public interest if the injunction is issued. [*Id*.]

The trial court determined that its grant of summary disposition to defendants rendered plaintiffs' motion for a preliminary injunction moot, and therefore, denied the motion. This was not an abuse of discretion. The objective of a preliminary injunction is to maintain the status quo, pending a final hearing on the parties' rights. *Mich AFSCME Council 25 v Woodhaven-*

*Brownstown Sch Dist*, 293 Mich App 143, 145; 809 NW2d 444 (2011). Summary disposition in favor of defendants, which is affirmed on appeal, renders moot any issue regarding whether plaintiffs are entitled to a preliminary injunction. Thus, the trial court did not abuse its discretion by failing to analyze the above factors to determine whether plaintiffs were entitled to injunctive relief because it was not required to.

Regardless, plaintiffs cannot establish the four factors required for entitlement to injunctive relief. *Davis*, 296 Mich App at 613-614. Plaintiffs were unlikely to prevail on the merits of their defamation claim because the statements in the press release were substantially true. Plaintiffs were unlikely to prevail on the merits of their tortious interference with business relationships claim because they could not prove that defendants intentionally interfered or acted with malice. Plaintiffs would not suffer irreparable harm if the injunction was not issued. *Id.* They had already suffered harm to their business reputations, and lost investments, but they failed to establish that this constituted irreparable harm that could not be cured by investments from other investors. There was no risk that plaintiffs would be harmed more by the issuance of the injunction than defendants would be harmed by the absence of such. *Id.* Rather, the injunction would impede on the free speech rights of defendants, as well as other government agencies. This coincides with the risk of harm to the public interest if the injunction were to issue because it would prevent defendants from submitting information to the public in the interest of news and transparency. Therefore, the trial court properly denied plaintiffs' motion for a preliminary injunction.

Affirmed.


/s/ David H. Sawyer
/s/ Mark J. Cavanagh
/s/ Deborah A. Servitto